## VILLAGE OF HUBBARD, OHIO, v. UNITED STATES et al.

(District Court, N. D. Ohio, E. D. March 13, 1922.)

No. 680.

1. **Commerce ☞95—Interstate Commerce Commission's findings, supported by evidence, are conclusive.**

The findings of the Interstate Commerce Commission are conclusive on the court, if supported by substantial evidence.

2. **Commerce ☞93—Municipality can sue to enjoin Commission's order contravening franchise contract.**

In view of Interstate Commerce Act, § 13 (Comp. St. § 8581), permitting municipal corporations to apply by petition to the Interstate Commerce Commission for the correction of certain forbidden practices, and conferring on the Commission authority to institute inquiries, on its own motion or on the petition of any carrier, into any rate or fare made or imposed by authority of any state, a municipal corporation, which has a franchise contract with a transportation railway company fixing the rate or fare, has the right in its corporate capacity to bring suit under Act Oct. 22, 1913 (Comp. St. § 998), to restrain the enforcement of an order of the Interstate Commerce Commission establishing different rates,

especially where the corporation might, under Gen. Code Ohio, §§ 4311, 4312, be a party to an action to enjoin a violation of the franchise or to enforce its terms.

3. **Commerce** ⊜⇒85—**Interstate Commerce Commission is not given jurisdiction over all interstate commerce.**

The Interstate Commerce Act does not, by its terms, confer jurisdiction on the Interstate Commerce Commission over all interstate carriers or all interstate commerce or traffic.

4. **Commerce** ⊜⇒85—**Electric railways not subject to interstate commerce, unless they possess characteristics specified in transportation act.**

Under Interstate Commerce Act, § 1, as amended by Transportation Act of 1920, making the act applicable to carriers engaged in the interstate transportation of passengers or property wholly by railroad, which was the same in that respect as the language of the original act, when construed with amended section 13 of that act, particularly in view of paragraphs 3 and 4 thereof, and sections 15a and 20a, which are added by sections 422 and 439 respectively of the Transportation Act of 1920, and with title 4, § 402, par. 22, title 2, § 209, and title 3, § 300, of that act, an electric street or interurban railway is not subject to the Interstate Commerce Commission unless it is being operated as part of a general steam railroad system, is engaged in the general business of transporting freight in addition to its passenger and express business, or does not have, as its principal source of operating revenue, urban, suburban, or interurban passenger traffic, or sale of power, heat, and light, or both.

5. **Commerce** ⊜⇒85—**Electric interurban railway held not "operated as part of system of steam railroads."**

An interurban electric railway which had two connections with a steam railroad system and received from it cars containing carload shipments for delivery to points along its line from the steam railroad, but was not related in management to the latter, or part of its system, was not operated as part of a general steam railroad system of transportation.

6. **Commerce** ⊜⇒85—**Interurban electric railway held not engaged in "general transportation of freight."**

Proof that an interurban electric railway carried some parcels, designated by the Commission as freight, in less than carload lots, but the receipts from which did not exceed 5 per cent. of its gross earnings, and the service was more nearly like that which is called express than freight traffic, does not show that the railroad was engaged in general transportation of freight, in addition to its passenger and express business.

In Equity. Suit by the Village of Hubbard, Ohio, against the United States and others, to restrain the enforcement of an order of the Interstate Commerce Commission. On motion by plaintiff for a preliminary injunction, and by defendants to dismiss the bill. Motion to dismiss denied, and preliminary injunction granted.

John J. Boyle and Moore, Barnum & Hammond, all of Youngstown, Ohio, for village of Hubbard.

Blackburn Esterline, Sp. Asst. Atty. Gen., for the United States.

Walter McFarland, of Washington, D. C., for Interstate Commerce Commission.

Douglass D. Storey (of Hause, Evans & Baker), of Harrisburg, Pa., and Union C. De Ford (of Harrington, De Ford, Huxley & Smith), of Youngstown, Ohio, for Pennsylvania-Ohio Power & Light Co.

Before DONAHUE, Circuit Judge, and KILLITS and WESTENHAVER, District Judges.

---

⊜⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

WESTENHAVER, District Judge. This suit is brought under the terms of the Act of October 22, 1913 (U. S. Comp. Stat. § 998). Plaintiff seeks a preliminary injunction restraining the Pennsylvania-Ohio Power & Light Company from putting into effect an order of the Interstate Commerce Commission made November 7, 1921. This order requires that company to cease and desist from practicing a certain undue prejudice, preference, advantage, and unjust discrimination found by the Commission to exist in the relation of intrastate and interstate passenger fares, and to establish, put in force, and maintain a certain schedule of passenger fares for the transportation of passengers in intrastate commerce between Hubbard, in the state of Ohio, and Youngstown, in the state of Ohio.

This cause has been heard, argued, and submitted upon plaintiff's application for a preliminary injunction, upon the motion of the defendants the United States and the Pennsylvania-Ohio Power & Light Company to dismiss plaintiff's bill, and upon the merits as affecting plaintiff's right to relief, as they arise upon an answer filed by the Interstate Commerce Commission. The motion to dismiss is on two grounds: (1) That plaintiff is without interest in the controversy and has no standing in this court to maintain its bill; (2) that the bill is without equity on its face and does not state a cause of action. The answer of the Interstate Commerce Commission sets up its findings of fact and its order, and contends that, inasmuch as these findings are supported by substantial evidence, they are conclusive upon the court, and hence that the plaintiff is not entitled to any relief. On this hearing the full transcript of the proceedings and testimony taken by the Interstate Commerce Commission, in addition to its report and order, were introduced in evidence, and are considered in disposing of the several matters presented for consideration.

Plaintiff assails the validity of the Interstate Commerce Commission's order on several grounds, which, stated in our own language, reduce themselves to two: (1) That Congress has not conferred jurisdiction on the Commission over an electric interurban railway company of the kind which the record shows the Pennsylvania-Ohio Power & Light Company to be, particularly over its purely intrastate transportation of passengers, conducted under state and municipal franchises which are in legal effect binding contracts; (2) that the franchise granted by the village of Hubbard to the predecessor in title of the Pennsylvania-Ohio Power & Light Company, and duly accepted by it and binding as a contract on the present defendant, requires the transportation of passengers between Hubbard, Ohio, and Youngstown, Ohio, at a fixed rate of fares, which franchise contract cannot be impaired by an order of the Interstate Commerce Commission, and is; indeed, beyond the constitutional power of Congress itself to annul and impair. Such, in brief, are the respective contentions.

The situation is fully and correctly set forth in the Interstate Commerce Commission's report, and, inasmuch as this has been published (64 I. C. C. 498), it will not be repeated here, except so far as is necessary to show clearly the questions to be decided and the basis of our decision. In 1901 a franchise ordinance was passed by the village of

Hubbard and accepted by the Youngstown & Sharon Railway Company, a corporation chartered as a street railway under the statutes of Ohio, to operate between Youngstown, Ohio, and Sharon, Pa. In 1917 this company was merged with four other Ohio corporations and one Pennsylvania corporation, under the name of the Mahoning & Shenango Railway & Light Company. This name was subsequently, in 1920, changed to the Pennsylvania-Ohio Electric Company. On November 21, 1920, a new corporation, the present defendant, the Pennsylvania-Ohio Power & Light Company, was organized to take over and operate the Youngstown-Sharon line. The line thus acquired by defendant, and now operated by it, extends from Youngstown, Ohio, only to the Ohio-Pennsylvania state line, and the defendant operates its cars from the state line into Sharon, Pa., a fractional part of a mile, over the tracks of the Shenango Valley Traction Company.

The maximum distance from Youngstown to Hubbard is 8.75 miles, and from Hubbard to Sharon is 7.18 miles. The franchise provides for the maintenance between Hubbard and Youngstown of a cash fare of 12 cents, and between Hubbard and Sharon of a cash fare of 13 cents. Between Hubbard and both cities the franchise requires the sale of round-trip tickets at the rate of 20 cents for a single ticket, special tickets good for 22 rides for $2, and 54-trip commutation tickets for $3.80. Effective February 15, 1920, this Mahoning & Shenango Railway & Light Company, then the owner and operator of defendant's line, by a tariff filed with the Interstate Commerce Commission, increased its one-way fare between Hubbard and Sharon to 20 cents, the price of a 54-trip commutation ticket to $5, and canceled the round trip and special tickets between these points. Subsequently the Pennsylvania-Ohio Electric Company, successor to the Mahoning & Shenango Railway & Light Company, also filed with the Interstate Commerce Commission a tariff, in which it proposed to establish the same rates of fare between Hubbard and Youngstown as those in effect between Hubbard and Sharon, as above stated, and also to increase and establish certain through fares between Sharon and Youngstown, being substantially the sum of the local fares.

A tariff carrying these same fares was presented to, and rejected by, the Public Utilities Commission of Ohio, in so far as it attempted to increase the fares between Hubbard and Youngstown, on the ground that this commission was without jurisdiction to allow and establish rates and charges in excess of those prescribed by franchise contracts. This seems to be the present state of the Ohio law. See Mahoning & Shenango Ry. & Light Co. v. Public Utilities Commission, 98 Ohio St. 303, 120 N. E. 835; Interurban Ry. Co. v. Public Utilities Commission, 98 Ohio St. 267, 120 N. E. 831, 3 A. L. R. 696; Toledo, Bowling Green & Southern Traction Co. v. Public Utilities Commission, 98 Ohio St. 305, 120 N. E. 835. In consequence of these complications the Pennsylvania-Ohio Power & Light Company filed its petition with the Interstate Commerce Commission, complaining of the undue preference and discrimination existing between interstate and intrastate passenger fares, which, after notice and on hearing, resulted in the order above stated, which plaintiff is seeking to enjoin.

[1] The Interstate Commerce Commission's findings of fact, it is settled law, are conclusive upon this court, if supported by substantial evidence. Interstate Commerce Commission v. Louisville & Nashville R. R. Co., 227 U. S. 88, 33 Sup. Ct. 185, 57 L. Ed. 431; Manufacturers' Ry. Co. v. United States, 246 U. S. 457, 481, 38 Sup. Ct. 383, 62 L. Ed. 831; Seaboard Air Line Ry. Co. v. United States, 254 U. S. 57, 62, 41 Sup. Ct. 24, 65 L. Ed. 129. The Commission's findings of fact in this situation are: That the interstate passenger cash and 54-ride commutation fares between Sharon and Hubbard, and also the interstate passenger fares between Sharon and Youngstown, are just and reasonable fares for interstate transportation between those points; that the maintenance of corresponding intrastate fares between Hubbard and Youngstown lower than the just and reasonable interstate fares between Sharon and Hubbard has resulted, and will result, in undue prejudice to persons traveling in interstate commerce over the petitioner's line in the state of Pennsylvania and between points in the state of Ohio and Sharon, Pa., in undue preference and advantage to persons traveling intrastate between points in Ohio, and in unjust discrimination against interstate commerce; also that, whether the passenger fares pertain to transportation in interstate commerce or to transportation in intrastate commerce, the transportation services are performed under substantially similar circumstances and conditions; and that said undue prejudice and preference and unjust discrimination can, and should, be removed by establishing intrastate passenger cash and 54-ride commutation fares between Hubbard and Youngstown not less than the interstate passenger fares found to be reasonable as between Hubbard and Sharon. It is ordered that passenger fares between Hubbard, Ohio, and Youngstown, Ohio, shall be charged which shall not be less than 20 cents when paid in cash and $5 for 54 rides when a commutation ticket is purchased.

Plaintiff's contention, that defendant's railroad is not that kind of a railroad engaged in interstate commerce or transportation which is made subject to the jurisdiction of the Interstate Commerce Commission, requires an inquiry as to whether the facts found in this respect by the Commission support its assumption of jurisdiction. Plaintiff contends that it is not engaged in the general business of transporting freight in addition to its passenger and express business, and that it is not operated as a part of a general steam railroad system of transportation. The controversy before the Commission involved nothing except passenger fares. In the Commission's report it is said:

"Petitioner is also engaged in the transportation of freight, as will be later explained."

Later in the report the facts in this regard are stated. The defendant has two connections, one direct, and the other over a private siding at Masury and at Stop 41, both between Hubbard, Ohio, and Sharon, Pa., with the New York Central Railroad. It does not originate and deliver freight traffic to the New York Central Railroad, but, during the years 1919 and 1920, 922 cars of freight were received by it from that line for delivery chiefly at points on defendant's line. The defendant also operates a daily less than carload freight or parcel

package service between Youngstown and Sharon, and on three days a week operates a through car for such service from Sharon, in Pennsylvania, to Newcastle, Pa. This through car, it will be noted, is loaded and operated wholly outside of the state of Ohio, and is transported on a line not owned by defendant. In 1919 this less than carload freight amounted to 6,240 tons and produced a gross revenue of $18,-000. The revenue from carload and switching services on cars received from the New York Central was $6,246.52. In 1920 the less than carload freight was 5,474 tons and produced a revenue of $21,-221, and the carload and switching traffic yielded $5,259. The passenger revenue receipts for 1920 were $332,173.43, and in 1921 were $367,-529.22. Thus it appears that the entire receipts from freight and switching services, including the carload freight from Sharon, in Pennsylvania, to Newcastle, Pa., are equal, substantially, to 7 per cent. only of the entire gross earnings. Plaintiff asserts that demurrage on cars received from the New York Central Railroad begins to run from the time the cars are delivered to the defendant's line, and that its less than carload freight from Youngstown to Sharon consists, in reality, only of parcels or packages more nearly akin to express service than to freight traffic.

[2] Upon these facts logically the first proposition of law to be considered is whether defendant's objection is sound, that the plaintiff is without interest in the controversy and has no standing in court. Neither in the oral argument nor in the briefs filed is this proposition given much consideration, and no authorities are cited supporting the contention. We assume this contention to be that the village of Hubbard in its corporate capacity has no such interest in the rights of passengers on defendant's railway, even though citizens and residents of the village of Hubbard, as will entitle it to maintain an action in their behalf, and that this case falls within the rules of law announced in Oklahoma v. Atchison, T. & S. F. Ry. Co., 220 U. S. 277, 31 Sup. Ct. 434, 55 L. Ed. 465. In this case it was held that the state of Oklahoma might not sustain an original bill in the United States Supreme Court to enjoin undue discrimination against its citizens in favor of citizens of the state of Kansas. The principles of that case are not applicable.

The village of Hubbard was served by the Interstate Commerce Commission with a copy of its order of investigation, appeared, and was heard. Section 13, Interstate Commerce Act (Comp. St. § 8581), permits municipal corporations to apply by petition to the Interstate Commerce Commission to correct certain forbidden practices. It also confers full power and authority upon the Commission to institute inquiries on its own motion or on the petition of any carrier into any rate or fare made or imposed by authority of any state. Obviously, therefore, if a franchise contract made by a municipality with a carrier is the basis of the inquiry, that municipality should be made a party and be given an opportunity to be heard, and, if so, it has the same right as any other party in interest to seek redress in this court against an erroneous or unlawful order of the Commission. It has long been the practice to permit representative associations and exchanges to insti-

tute and maintain proceedings before the Commission and to be heard in court against its orders. See Judson on Interstate Commerce (3d Ed.) § 437. In City of New York v. United States et al. (D. C.) 272 Fed. 768, a municipal corporation, the city of New York, was the party plaintiff, and, although relief was denied on the merits, it was expressly held that the city's interest was such as entitled it to maintain the action.

Moreover, Ohio municipal corporations, when parties to a franchise contract, may be parties to actions to enjoin a violation or to enforce the terms thereof. G. C. §§ 4311 and 4312; City of Springfield v. Springfield Gas Co., 12 Ohio Cir. Ct. R. (N. S.) 392, affirmed without report 81 Ohio St. 537, 91 N. E. 1139. No good reason is perceived why the plaintiff, as a party to a franchise contract injuriously affected, may not, both here and before the Interstate Commerce Commission, become a party to and maintain such suits as are necessary to assert and protect its contract rights.

Defendant's objection that plaintiff's bill does not state a cause of action, and plaintiff's objection that the order of the Interstate Commerce Commission is void because defendant's electric street or interurban railway is not brought within the power and authority conferred by Congress on the Commission, depend upon the same considerations, and will be considered together. Plaintiff's objection that the order of the Commission, if within the apparent power thus conferred on the Commission, is none the less void because it invades the reserved power of a state over purely intrastate transportation, or because it impairs the obligations of a franchise contract, depends upon separate and independent considerations. We shall consider these propositions in the reverse order.

In the view we take of this case it becomes unnecessary to consider any question of constitutional power on the part of Congress. It is true that franchise grants, under the law of Ohio, are contracts binding upon both parties, and that the state of Ohio may not impair the obligation thereof. It is also true that a franchise of the kind under consideration, fixing the rate to control beyond the limits of the municipality granting it, is within the power conferred upon municipalities by the Legislature of Ohio, and is valid and binding between the parties to it. See Interurban Railway & Terminal Co. v. City of Cincinnati, 93 Ohio St. 108, 112 N. E. 186; Interurban Railway Co. v. Public Utilities Commission, 98 Ohio St. 287, 120 N. E. 831, 3 A. L. R. 696; City of Cleveland v. Cleveland City Ry. Co., 194 U. S. 517, 24 Sup. Ct. 756, 48 L. Ed. 1102; Columbus Railway, Power & Light Co. v. Columbus, 249 U. S. 399, 39 Sup. Ct. 349, 63 L. Ed. 669, 6 A. L. R. 1648. It may also be true that the principles of law announced in Houston & Texas Ry. Co. v. United States, 234 U. S. 343, 34 Sup. Ct. 833, 58 L. Ed. 1341, known as the Shreveport Case; American Express Co. v. Caldwell, 244 U. S. 617, 37 Sup. Ct. 656, 61 L. Ed. 1352; Illinois Central Railway Co. v. Public Utilities Commission, 245 U. S. 493, 38 Sup. Ct. 170, 62 L. Ed. 425; and particularly in Railroad Commission of Wisconsin v. Chicago, Burlington & Quincy R. R. Co., 257 U. S. ——, 42 Sup. Ct. 232, 66 L. Ed. ——, decided by the United States

Supreme Court February 27, 1922, known as the Wisconsin Passenger Fare Case—are not applicable to the precise situation here presented. However, we pass, without deciding, the questions raised and argued on this contention of plaintiff, for the reason that we are content to dispose of the case upon a consideration of plaintiff's other contention.

Plaintiff contends that upon the facts as found the Pennsylvania-Ohio Power & Light Company is not a street electric passenger railway engaged in the general business of transporting freight in addition to its passenger and express business, nor a street or suburban electric railway operated as a part of a general steam railroad system of transportation, nor an interurban electric railway operated as a part of a general steam railroad system of transportation or engaged in the general transportation of freight, but, on the other hand, is a street or interurban electric railway of a different character, and such as has not been made subject to the jurisdiction of the Interstate Commerce Commission.

[3] Apparently, then, the question at issue comes down to one of power in the Interstate Commerce Commission; that is to say, the power and authority conferred on the Commission by the Interstate Commerce Act (24 Stat. 379). That act does not by its terms, confer jurisdiction on the Interstate Commerce Commission over all interstate carriers, or all interstate commerce or traffic. It is limited to interstate commerce or transportation carried on by certain kinds of interstate carriers. Thus Mr. Justice Lamar, delivering the opinion in Omaha Street Railway v. Interstate Commerce Commission, 230 U. S. 324, 336, 33 Sup. Ct. 890, 891 (57 L. Ed. 1501, 46 L. R. A. [N. S.] 385), said:

"When these street railroads carry passengers across a state line they are, of course, engaged in interstate commerce, but not the commerce which Congress had in mind when legislating in 1887."

It was accordingly held that an electric street railway, operating in and between Council Bluffs, Iowa, and Omaha, Neb., over a bridge across the Missouri river constructed for freight and passenger traffic under an act of Congress, was not subject to the jurisdiction, nor its rates within the control, of the Interstate Commerce Commission. A careful examination, therefore, of the several provisions of the Interstate Commerce Act becomes necessary.

From 1887 to 1906 the purview of the act was limited to commerce between the states carried by railroads. By the Hepburn Act of 1906 (34 Stat. 584) oil pipe lines, express companies, and sleeping car companies were brought within its scope. By the act of 1910 (36 Stat. 539) were added telegraph, telephone, and cable companies. The Transportation Act of 1920 (41 Stat. 456) leaves the provisions of the act as to the carriers subject to the jurisdiction of the Commission as they were in these previous acts, but refers more frequently to street or suburban and interurban electric railways, in order to exclude them from the purview of certain provisions and sections of the act. Section 400 provides, among other things, as follows:

"That the provisions of this act shall apply to common carriers engaged in (a) the transportation of passengers or property *wholly by railroad*,[1] or partly by railroad and partly by water when both are used under a common control, management, or arrangement for a continuous carriage or shipment, * * * but shall not apply (a) to the transportation of passengers or property, or to the receiving, delivering, storage, or handling of property, *wholly within one state* and not shipped to or from a foreign country· from or to any place in the United States as aforesaid."

The most material language of the provision above quoted are the words "wholly by railroad" and "transportation of passengers or property * * * wholly within one state." This language was in section 1 of the act of 1887, and has been repeated in this section every time the section has been amended. This section was amended and re-enacted with this language in the Transportation Act of 1920, and must, in ascertaining the meaning of the act, be given equal weight and significance with new paragraphs 3 and 4 of amended section 13, so much relied on by defendants. For the purposes of this case our inquiry is limited to a determination of what are common carriers by railroad, and the further inquiry is: What is a railroad, within the purview of this act? The definitions of "common carrier" and of "railroad" and of "transportation" in paragraph 3, section 400, Transportation Act, 1920, give no aid in answering these inquiries.

It was not until the amendments of June 18, 1910, that street electric railways are mentioned in the act. The authority previously conferred to establish through routes, subject to the limitation "that no reasonable or satisfactory through routes exist," was by the 1910 amendment enlarged, so that the Commission might thereafter, whenever it deemed it necessary or desirable in the public interest, establish through routes without regard to existing routes. This power, however, was limited by a provision in these words:

"The Commission shall not, however, establish any through route, classification, or practice, or any rate, fare, or charge, between street electric passenger railways not engaged in the general business of transporting freight in addition to their passenger and express business, and railroads of a different character."

This language is ambiguous. Previous to its enactment, the Interstate Commerce Commission had assumed jurisdiction over electric street railways carrying passengers alone in numerous cases. See Willson v. Rock Creek Ry. Co., 7 Interst. Com. Com'n R. 83; Chicago & M. Electric R. Co.· v. Illinois Cent. R. Co., 13 Interst. Com. Com'n R. 20; Beall v. Washington, A. & Mt. V. Ry. Co., 20 Interst. Com. Com'n R. 406; Cincinnati & Columbus Traction Co. v. Baltimore & O. S. R. Co. et al., 20 Interst. Com. Com'n R. 486. The provision above quoted, it was' argued, was an indirect recognition that this jurisdiction was rightfully assumed, and also a recognition by implication that electric street railways were railroads as defined in section 1, and were therefore subject to the jurisdiction of the Commission. On the other hand, it was urged that this proviso was inserted out of an abundance of caution, and to repel the implication that the word "railroad," as used

[1] Italics in this opinion are ours.

in section 1, did include street electric railways as well as railroads, well-known highways of interstate commerce, as understood when the original act was passed. In Omaha Street Railway Co. v. Interstate Commerce Commission, 230 U. S. 324, 33 Sup. Ct. 890, 57 L. Ed. 1501, 46 L. R. A. (N. S.) 385, decided June 9, 1913, this difference of opinion was settled by holding that "railroads," as used in the Interstate Commerce Act, was limited to railroads, as distinguished from street railroads, and that the proviso of June 28, 1910, above quoted, was probably inserted out of an abundance of caution, and did not warrant the holdings, previously made by the Interstate Commerce Commission and by the Commerce Court, that ordinary street electric railways engaged in interstate transportation of passengers had been brought within the jurisdiction of the Interstate Commerce Commission.

This case will be referred to again at more length, but, before doing so, the several additional references to street electric railways in the Interstate Commerce Act should be noted. In section 402, paragraph 22, Transportation Act 1920, it is provided:

"The authority of the Commission conferred by paragraphs (18) to (21), both inclusive, shall not extend to the construction or abandonment of spur, industrial, team, switching or side tracks, located or to be located wholly within one state, or of street, suburban, or interurban electric railways, *which are not operated as a part or parts of a general steam railroad system of transportation.*"

New section 15a (Transp. Act 1920, § 422) is, in part, as follows:

"When used in this section * * * the term 'carrier' means a carrier by railroad or partly by railroad and partly by water, within the continental United States, subject to this act, excluding (a) sleeping car companies and express companies; (b) *street or suburban electric railways* unless operated as a part of a general steam railroad system of transportation; (c) *interurban electric railways* unless operated as a part of a general steam railroad system of transportation or engaged in the general transportation of freight."

It should be noted that this definition of the word "carrier" is for the purposes of section 15a. That section has for its object the establishment of such tariff rates as will enable the carriers, either as a whole or in groups, to earn an annual net railway operating income equal as near as may be to a fair return upon the aggregate value of their property. In passing, it should also be noted that the provisions of this section and of section 20a are the main support of the enlarged jurisdiction of the Interstate Commerce Commission to fix purely intrastate rates, as will appear from a reading of Chief Justice Taft's opinion in the Wisconsin Passenger Fare Case above cited.

New section 20a (Transp. Act 1920, § 439) provides, in part, as follows:

"That as used in this section the term 'carrier' means a common carrier by railroad (except a street, suburban, or interurban electric railway which is not operated as a part of a general steam railroad system of transportation), which is subject to this act, or any corporation organized for the purpose of engaging in transportation by railroad subject to this act."

This definition likewise is for the purposes of that section, and the section deals with the issue of capital stock or other securities by rail-

roads, and confers wide powers with respect thereto upon the Interstate Commerce Commission.

The foregoing are all the references to street electric railways or interurban railways found in the Interstate Commerce Act. However, two other references thereto are found in other parts of the Transportation Act of 1920. In section 209, providing for a guaranty to carriers during a limited period after termination of federal control, it is provided:

"When used in this section—the term 'carrier' means (1) a carrier by railroad or partly by railroad and partly by water, whose railroad or system of transportation is under federal control at the time federal control terminates, or which has heretofore engaged as a common carrier in general transportation and competed for traffic, or connected, with a railroad at any time under federal control; and (2) a sleeping car company whose system of transportation is under federal control at the time federal control terminates; but does not include a street or interurban electric railway not under federal control at the time federal control terminates, *which has as its principal source of operating revenue urban, suburban, or interurban passenger traffic or sale of power, heat, and light, or both.*"

In section 300, title 3, creating the Labor Board, to deal with disputes between carriers and their employees and subordinate officials, it is provided:

"When used in this title—(1) The term 'carrier' includes any express company, sleeping car company, and any carrier by railroad, subject to the Interstate Commerce Act, except a street, interurban, or suburban electric railway not operating as a part of a general steam railroad system of transportation."

Summarizing and bringing together the references to carriers above quoted, otherwise than by railroad, we find street electric railways referred to in these several words: In section 1, paragraph 22, it is:

"Street, suburban, or interurban electric railways, which are not operated as a part or parts of a general steam railroad system of transportation."

In section 15, as amended June 18, 1910, and re-enacted February 28, 1920, the reference is to:

"Street electric passenger railways not engaged in the general business of transporting freight in addition to their passenger and express business."

In new section 15a the reference is to:

"Street or suburban electric railways unless operated as a part of a general steam railroad system of transportation."

Also to:

"Interurban electric railways unless operated as a part of a general steam railroad system of transportation or engaged in the general transportation of freight."

In new section 20a the reference is to:

"Street, suburban, or interurban electric railway which is not operated as a part of a general steam railroad system of transportation."

In section 209, title 2, Transportation Act of 1920, the reference is to:

"A street or interurban electric railway * * * which has as its principal source of operating revenue urban, suburban, or interurban passenger traffic."

In section 300, title 3, the reference is:

"A street, interurban, or suburban electric railway not operating as a part of a general steam railroad system of transportation."

[4] Despite these differences in phraseology, there is a marked similarity in the characteristics attributed to street electric railways, which include them within the jurisdiction of the Commission. These characteristics are: (a) Being operated as a part or parts of a general steam railroad system of transportation; (b) engaged in the general business of transporting freight in addition to their passenger and express business; (c) having as its principal source of operating revenue, urban, suburban, or interurban passenger traffic, or sale of power, heat, and light, or both. In the varied instances, street electric railways, whether urban, suburban, or interurban, which do not have these characteristics, are excluded from the jurisdiction of the Commission. If they have those characteristics, obviously they would be under the jurisdiction of the Commission. This being true, does it not follow that defendant's railway, even though an interurban electric railway engaged in the interstate transportation of passengers, must be regarded as outside the jurisdiction and control of the Commission, unless it possesses one or more of these distinguishing characteristics? Before this question is answered we shall review the pertinent decisions.

As already stated, the Interstate Commerce Commission early assumed jurisdiction over street or interurban electric railways, if engaged to any extent in the interstate transportation of passengers, even if not engaged in the general transportation of freight. See the references above given. In Omaha & Council Bluffs Street Railway Co. v. Interstate Commerce Commission (C. C.) 179 Fed. 243, Circuit Judges Sanborn, Hook, and Adams, differing from the Interstate Commerce Commission, held that street railway companies engaged in operating street cars by electricity for the transportation of passengers were not within the definition of common carriers by railroad, as used in section 1 of the Interstate Commerce Act, but that common carriers by railroad meant commercial railroad companies engaged in the general transportation of freight and passengers. Accordingly a preliminary injunction was awarded against the Commission's order undertaking to regulate interstate transportation of passengers by an electric street railway. This case was transferred to the United States Commerce Court, and that court, on final hearing, reversed the Circuit Judges. See 191 Fed. 40. The United States Supreme Court, in Omaha Street Railway Co. v. Interstate Commerce Commission, supra, reversed the Commerce Court and affirmed the Circuit Court. In appraising the force and effect of this decision it is necessary to take into account the long line of Interstate Commerce Commission decisions prior thereto holding to the contrary, and to note carefully the reasoning of the Commerce Court in sustaining them. There is marked similarity in that reasoning and in the reasoning of the later opinions of the Interstate Commerce Commission, upon the basis of which the order now under consideration was made.

Mr. Justice Lamar, delivering the unanimous opinion of the Supreme Court, holding that street electric railways, although engaged in inter-

state transportation of passengers, were not common carriers by rail-road, as defined in section 1 of the Interstate Commerce Act, gives reasons therefor which, it seems to us, are as sound to-day as they were in 1913. He says:

"Applying this universally accepted rule of construing this word, it is to be noted that ordinary railroads are constructed on the companies' own property. The tracks extend from town to town and are usually connected with other railroads, which themselves are further connected with others, so that freight may be shipped, without breaking bulk, across the continent. Such railroads are channels of interstate commerce. Street railroads, on the other hand, are local, are laid in streets as aids to street traffic, and for the use of a single community, even though that community be divided by state lines or under different municipal control. When these street railroads carry passengers across a state line, they are, of course, engaged in interstate commerce, but not the commerce which Congress had in mind when legislating in 1887."

Further:

"The railroads referred to in the act were not those having separate, distinct and local street lines, but those of whom it was required that they should make joint rates and reasonable facilities for interchange of traffic with connecting lines, so that freight might be easily and expeditiously moved in interstate commerce."

The mischief which Congress intended to remedy by the Interstate Commerce Act is adverted to as a reason tending to show that street electric railroads were not within the purview of section 1. Street railroads, he said, "had not engaged in the pooling, rebating, and discrimination which the statute was intended to prohibit." The question, it is true, is left open as to the proper classification of that new type of interurban railway developed since 1887 and which," with electricity as motive power, uses larger cars and runs through the country from town to town, enabling the carrier to haul passengers, freight, express, and mail for long distances at high speed." It is intimated that such electric interurban railways might be included within the definition of "common carrier by railroad," as used in section 1, but no opinion is expressed.

So far as we have discovered, the United States Supreme Court has not again given any consideration to this precise question. It has, however, considered the definition of a street or electric interurban railway as used in the Safety Appliance Act (Comp. St. § 8605 et seq.) and the federal Employers' Liability Law (Comp. St. §§ 8657–8665)—see Kansas City v. McAdow, 240 U. S. 51, 36 Sup. Ct. 252, 60 L. Ed. 520; Spokane & Inland R. Co. v. Campbell, 241 U. S. 497, 36 Sup. Ct. 683, 60 L. Ed. 1125—and has held that an interurban electric railway, operating from city to city and engaged in interstate traffic, is within the purview thereof. The reason for these holdings is that exceptions within a remedial statute are to be strictly construed, and inasmuch as interurban electric railways engaged in the interstate transportation of passengers are within the mischief to be remedied just as much as interstate steam railroads, the exception should be limited to street railways within cities and upon city streets and in their immediate suburbs. On the other hand, the rule of construction applicable to acts of Congress encroaching upon the power of a state to regulate and

control the transportation of passengers and property within a state is one of strict construction, and will not include intrastate traffic unless the intent is plainly expressed. Thus, in Illinois Central R. Co. v. Public Utilities Commission, 245 U. S. 493, 510, 38 Sup. Ct. 170, 176 (62 L. Ed. 425), it is said:

"In construing federal statutes enacted under the power conferred by the commerce clause of the Constitution, the rule is that it should never be held that Congress intends to supersede or suspend the exercise of the reserved powers of a state, even where that may be done, unless, and except so far as, its purpose to do so is clearly manifested."

In South Covington & Cincinnati Street Railway Co. v. City of Covington, 235 U. S. 537, 35 Sup. Ct. 158, 59 L. Ed. 350, L. R. A. 1915F, 792, much relied on by defendants, the decision is wholly inapplicable and deals with entirely different questions. Nor does it seem to us that the question under consideration is materially affected, much less controlled, as is contended by defendants' counsel, by the Shreveport Case, supra, American Express Co. v. Caldwell, supra, Illinois Central R. R. v. Public Utilities Commission, supra, nor by new paragraphs 3 and 4, section 13, Interstate Commerce Act, nor by the decision in the Wisconsin Rate Case.

The question here is what interstate carriers by railroad and what classes of interstate and intrastate traffic are brought within the jurisdiction of the Interstate Commerce Commission. This is a question of intention, and is to be ascertained from the provisions of the Interstate Commerce Act, including its original as well as amended provisions, and the several decisions of the Supreme Court construing the same. The decision in the Wisconsin Rate Case rests heavily, if not entirely, upon new section 15a and new section 20a, both of which excluded street and interurban electric railways from the purview thereof, unless operated as a part of a general steam railroad system of transportation or engaged in the general transportation of freight. The newly added powers and duties, including those conferred by paragraphs 3 and 4 of new section 13, apply only to railroads of a certain character, and do not include electric street and interurban railways unless thus engaged. Assuming for the purpose of this opinion the existence in Congress of a power to include all street and interurban electric railways, and to invalidate all municipal and state franchises relating to purely intrastate traffic, upon the principles of the Shreveport and the Wisconsin Rate Cases, nevertheless the intent so to do will not be inferred unless and except so far as it is clearly manifested.

From the foregoing considerations we deduce these conclusions:

Electric street, suburban, or interurban railways are included within "common carriers by railroad," as that expression is used in section 1 of the Interstate Commerce Act, only when they are of that character and engaged in that kind of traffic and under the conditions set forth in the parts of the Interstate Commerce Act and the Transportation Act of 1920 as above quoted. They must be operated as a part or parts of a general steam railroad system of transportation, or they must be engaged in the general business of transporting freight in addition to their passenger and express business, or they must be operated as a part of a general steam railroad system of transportation or engaged in the

general transportation of freight. If they are not thus engaged or being thus operated, they are not within the act, nor within the jurisdiction conferred on the Interstate Commerce Commission, even though they may be engaged in interstate passenger business.

This, it seems to us, is the only proper interpretation and effect of the several amendments to the Interstate Commerce Act, made since the decision in the Omaha Street Railway Case. In that case, as already stated, it was left a query as to whether the act included the new type of interurban railroad developed since the original act was passed, which operates with electricity as motive power, uses larger cars, and runs through the country from town to town, enabling the carrier to haul passengers, freight, express, and mail for long distances at high speed. It is true that Congress, in excluding electric street and interurban railways, did not use this descriptive language; but it used other language continuously and consistently, which does exclude all electric street or interurban railways which do not possess these dominating characteristics—that is to say, that are not operated as a part of a general steam railroad system of transportation or are not engaged in the general transportation of freight in addition to their passenger and express business. It seems evident that Congress intended to leave, and did leave, all street and interurban electric railways not thus operated, nor doing business of that character, in the situation in which they were left by the decision in the Omaha Street Railway Case.

This conclusion is greatly strengthened by the additions to the Interstate Commerce Act made by the Transportation Act of 1920. The establishment of the Labor Board to settle controversies between carriers and employees, the guaranty for a limited period of a fixed return upon railroads, the grouping of railroads into classes, and requiring rates to be fixed so as to allow a fair return to be earned on the property as a whole, the control assumed and exercised over the construction of new railroads, and the making of extensions and the issuance and sale of securities, are all a part of a general scheme from which all street or interurban electric railways are excluded, unless possessing these characteristics.

[5] The remaining inquiry is whether or not, on the facts found by the Interstate Commerce Commission, the defendant railway was operated as a part of a general steam railroad system of transportation, or was engaged in the general transportation of freight, in addition to its passenger and express business. Plainly and admittedly the defendant railway was not operated as a part of a general system of steam railroads for transportation. It had two switching connections, one direct and the other over a private siding, with the New York Central, a system of steam railroads; but it was independently operated, and not as a part of that system. Its traffic relations with the New York Central were limited to receiving over these switches a few carloads of inbound freight; and, so far as the New York Central is concerned, delivery was made and demurrage began to run as soon as those cars were received by the defendant railway.

[6] Nor can it be said upon the facts found that the defendant railway was engaged in the general transportation of freight in addition to its passenger and express business. It is true that the Commission's

report refers thereto as less than carload freight; but this freight service appears to have consisted of packages and parcels, and is more nearly like that which is called express than freight traffic. In any event, the amount thereof is exceedingly limited, not exceeding 5 per cent. of the gross earnings of the defendant company. Such an incidental and relatively insignificant and unimportant freight business cannot be called the general transportation of freight in addition to its express business.

Our conclusion is that the order of the Interstate Commerce Commission is in excess of any power and jurisdiction conferred upon it by the Interstate Commerce Act, and is void and without effect. The motion to dismiss will be denied, and a preliminary injunction will be granted as prayed.