# STATE OF OKLAHOMA *v.* ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY.

## BILL IN EQUITY.

No. 13, Original.   Argued February 23, 1911.—Decided April 3, 1911.

While the territorial condition lasts the governmental power of Congress over a Territory and its inhabitants is exclusive and paramount, except as restricted by the Constitution.

An act of Congress, regulating railway charges of a railway in a Territory until a state government is formed and providing that thereafter such State shall have authority to regulate the charges, ceases to be of force on the admission of such State into the Union; and thereafter the State can fix such charges, subject only to the constitutional rights of the railway; and so *held* as to §§ 1–4 of the act of July 4, 1884, c. 179, 23 Stat. 73.

A State in its corporate capacity has no such interest in the rights of shippers as to entitle it to maintain an original action in this court against the carrier to restrain it from charging unreasonable rates within its jurisdiction. *Louisiana* v. *Texas*, 176 U. S. 1.

The original jurisdiction conferred by the Constitution on this court does not include every cause in which the State elects to make itself a party to vindicate the rights of its people or to enforce its own laws or public policy against wrong done generally.

THE facts, which involve the construction of the provisions of the Constitution of the United States conferring original jurisdiction on this court in controversies in which a State is a party, are stated in the opinion.

Mr. Charles West, Attorney General of the State of Oklahoma, for complainant:

The Attorney General of Oklahoma has authority to file the bill. *Leedy* v. *Brown*, unreported (Okla.); *State* v. *Welbes*, 73 N. W. Rep. 820; *St. Louis & S. F. Ry. Co.* v. *Hadley*, 161 Fed. Rep. 419; *United States* v. *San Jacinto Tin Co.*, 125 U. S. 273; *Ex parte Young*, 209 U. S. 123;

act of June 18, 1910; rules made for *Chisholm* v. *Georgia*, 2 Dall. 479; *Minnesota* v. *Northern Securities Co.*, 184 U. S. 199; *Florida* v. *Anderson*, 91 U. S. 667

The State has justiciable rights here. *Pennsylvania* v. *Wheeling B. Co.*, 13 How. 519; *South Carolina* v. *Georgia*, 93 U. S. 4; *Wisconsin* v. *Duluth*, 96 U. S. 379; *In re Debs*, 158 U. S. 564; *Louisiana* v. *Texas*, 176 U. S. 1; *Kansas* v. *Colorado*, 185 U. S. 141; *Georgia* v. *Tennessee Co.*, 206 U. S. 238; *Hudson Water Co.* v. *McCarter*, 209 U. S. 355.

If equity should take jurisdiction for a part it will retain jurisdiction for complete relief and not force separation of efforts in suits at law. *United States* v. *Union Pacific Co.*, 160 U. S. 1. Equity jurisdiction enjoins illegal acts by corporations affecting public at large. *Attorney General* v. *Great Northern Co.*, 62 Eng. Rep. Reprint, 337; *Attorney General* v. *Delaware Ry. Co.*, 27 N. J. Eq. 631; *Muncie Nat. Gas Co.* v. *Muncie* (Ind.), 60 L. R. A. 822; *Gas Light Co.* v. *Zanesville*, 47 Oh. St. 35; *Attorney General* v. *Chicago &c. Co.*, 35 Wisconsin, 425; *Attorney General* v. *Jamaica Pond Co.*, 123 Massachusetts, 361; Thompson, Corporations, 2d ed., §§ 5680, 5721. As to injunctions to restrain excessive rates, see *Tift* v. *Southern Ry. Co.*, 123 Fed. Rep. 794, and cases there cited; *State* v. *Pacific Express Co.* (Neb.), 115 N. W. Rep. 619; *Madison* v. *Gas Co.* (Wis.), 108 N. W. Rep. 65.

The State can ask for a cancellation of the grant. When a Territory becomes a State it may refuse recognition of anything that the State might have repudiated if the grant had come from itself in the first instance. *Railroad Co.* v. *Baldwin*, 103 U. S. 431.

If the United States might have forfeited the right before statehood, that power belongs to the State now. *Van Wick* v. *Knevals*, 106 U. S. 396. The grants in the territory purchased from France made for a public purpose create a trust for the public. *New Orleans* v. *United States*, 10 Pet. 662; see also 6 Missouri, 524; *Mayor &c.* v.

*Eslava,* 9 Porter, 577, 602; *Dunham* v. *Lamphere,* 3 Gray, 268; *Hart* v. *Burnett,* 15 California, 530.

The grant made to the Southern Kansas Railroad was for a public purpose. *Cherokee Nation* v. *Southern Kansas Ry. Co.,* 135 U. S. 641. The United States before statehood might have declared a forfeiture either by legislative action or judicial proceedings. *United States* v. *Repentigny,* 5 Wall. 211, 267; *Utah N. & C. Ry. Co.* v. *Utah & C. Ry. Co.,* 110 Fed. Rep. 879.

Before statehood the United States was a trustee for the Territory. *Hinman* v. *Warren,* 6 Oregon, 409; *Pollard's Lessee* v. *Hagan,* 3 How. 212, 220.

Until the primary disposal the authority of the United States to control them is complete, but ends entirely at the primary disposal thereof. *David* v. *Rickabaugh,* 32 Iowa, 543; *Farrington* v. *Wilson,* 29 Wisconsin, 383; *Gibson* v. *Chouteau,* 3 Wall. 13; *Irvine* v. *Marshall,* 20 How. 558; *State* v. *Bachelder,* 5 Minnesota, 223; *Shiveley* v. *Bowlby,* 152 U. S. 1.

Since statehood, the United States has had no authority to cancel the grant or control the trust. *United States* v. *Illinois Central Ry. Co.,* 154 U. S. 225, 239. The United States has no control over the internal commerce of a State. *Louisville* v. *Mississippi,* 133 U. S. 587; *Geer* v. *Connecticut,* 161 U. S. 519; *Sands* v. *Manistee Co.,* 123 U. S. 288; *Covington Bridge Co.* v. *Kentucky,* 145 U. S. 204.

The primary duty of the company is to the local business. *Lake Shore R. R. Co.* v. *Ohio,* 173 U. S. 285, 301; *Cleveland Company* v. *Illinois,* 177 U. S. 521.

The grant is now an act of the State. § 2 Schedule of Const. of Oklahoma.

The act of July 4, 1884, § 2, provides for a reversion to the tribe itself, but all the Indian tribes have ceased to be nations. A grant to a railroad and its successors and assigns does not give the right to it to sell or assign its property to another corporation. *Oregon R. R. Co.* v. *Ore-*

*gonian R. R. Co.,* 130 U. S. 1; *Thomas* v. *Railroad Co.,* 101 U. S. 1. The Southern Kansas Railway had no authority to sell to the respondents. *Briscoe* v. *Southern Kansas Ry. Co.,* 40 Fed. Rep. 273.

The jurisdiction of this court if it exists should be applied. *Cohens* v. *Virginia,* 6 Wheat. 404; *California* v. *Southern Pacific Ry. Co.,* 157 U. S. 229, 269.

The limitation does not end with the Government's jurisdiction.

Laws may as well be enacted by reference as by reenacting specific words. *Chenango Bridge Co.* v. *Binghamton Co.,* 3 Wall. 51; *Schwenke* v. *Union D. & R. Co.,* 7 Colorado, 512; *S. C.* 4 Pac. Rep. 905; *In re Larkin,* 1 Oklahoma, 53; *Pridgeon* v. *United States,* 153 U. S. 53.

Though Congress may regulate interstate business and incorporate companies therefor, yet the police power of the State remains intact. *Louisville Co.* v. *Kentucky,* 161 U. S. 702; *Cleveland Co.* v. *Illinois,* 177 U. S. 516.

*Mr. Robert Dunlap,* with whom *Mr. Gardiner Lathrop* was on the brief, for respondent:

The General Government alone and not the State of Oklahoma has the right to enforce obedience to the terms of the grant found in one of its laws.

The act of Congress in question granting the right to construct, operate, and use the railway constructed thereunder was passed under the constitutional power of that body to regulate commerce among the several States and with the Indian tribes. *Cherokee Nation* v. *Southern Kansas Ry. Co.,* 135 U. S. 641; *California* v. *Pacific R. R. Co.,* 127 U. S. 39, 40; *United States* v. *Southern Pacific R. R. Co.,* 146 U. S. 570, 606, 607. Congressional authority to institute proceedings to revoke or forfeit the grant is necessary. *United States* v. *Northern Pacific Ry. Co.,* 177 U. S. 440; *California* v. *Southern Pacific Co.,* 157 U. S. 229; *Oregon* v. *Hitchcock,* 202 U. S. 60, 68, 69.

The provision of the act of Congress referred to in the bill in respect to freight rates ceased to be operative on the creation of the Territory of Oklahoma with reference to the lines embraced therein and certainly on the creation of the State.

In any event a bill in equity does not lie since mandamus is the appropriate remedy at law to enforce the performance of a public duty.   Dillon on Municipal Corporations, 4th ed., §§ 826, 906; *In re Sawyer*, 124 U. S. 200; *Missouri Pacific Ry. Co.* v. *United States*, 189 U. S. 274; *Attorney General* v. *Utica Insurance Co.*, 2 Johnson Ch. 371.

The main purpose of the bill, however, seems to be to secure a forfeiture of the rights and privileges granted by Congress, which could only be accomplished or effected in *quo warranto* proceedings on the part of the United States.

The bill does not set up a controversy between the State and the railway company justiciable in this court under the exercise of its original jurisdiction. *Louisiana* v. *Texas*, 176 U. S. 1.

The State is not the successor of the General Government.   The authority of Congress in the premises is still effective.   The power of Congress was exercised not merely over a Territory or only as of a local nature, but under the power to regulate interstate commerce, a matter of national concern.   *Wilmington R. R. Co.* v. *Reid*, 13 Wall. 264, 268; *Gulf & Ship Island R. R. Co.* v. *Hewes*, 183 U. S. 77; *Luxton* v. *North River Bridge Co.*, 153 U. S. 525, 529, 533; *Southern Pacific R. R. Co.* v. *United States*, 183 U. S. 526, 527; *Railroad Co.* v. *Peniston*, 18 Wall. 5, 34, 35, 36.

The State is not entitled to the equitable relief sought. The provision of the act of Congress relied upon ceased to be applicable with statehood.   In respect to any claim of forfeiture of rights granted by Congress no case is presented, and, in any event, the Federal Government, being

the sovereign power which granted the rights, could alone insist upon a forfeiture.

Mr. Justice Harlan delivered the opinion of the court.

This is an original suit in this court by the State of Oklahoma against the Atchison, Topeka and Santa Fé Railway Company, a corporation of Kansas.

The case as *made by the allegations of the bill*, in connection with acts of Congress and with the constitution and laws of Oklahoma, is substantially as will be now stated.

The treaty of April 30, 1803, between the United States and France, by which the Territory of Louisiana was ceded to the United States, provided that the inhabitants of that Territory should be incorporated into the Union and admitted as soon as possible, according to the principles of the Federal Constitution, to the enjoyment of all the rights, advantages and immunities of citizens of the United States; in the meantime to be maintained and protected in the free enjoyment of their liberty, property and the religion they profess. Art. III. The State of Oklahoma was formed out of a part of this ceded Territory.

By an act of Congress of July 4, 1884, the Southern Kansas Railway Company of Kansas was empowered to locate, construct, own, equip, operate, use and maintain a railway, telegraph and telephone line through the Indian Territory, over a specified route. The act forbade the company to charge "the inhabitants of said Territory a greater rate of freight than the rate authorized by the laws of the State of Kansas for services or transportation of the same kind" and provided that "passenger rates on said railway shall not exceed three cents per mile." And Congress expressly reserved the right to regulate the charges for freight and passengers on the railway as well as messages on telegraph and telephone lines, "until a State government or governments shall exist in said Terri-

tory, within the limits of which said railway or a part thereof shall be located; and then such State government or governments shall be authorized to fix and regulate the cost of transportation of persons and freights within their respective limits by said railway." Congress also reserved "the right to fix and regulate at all times the cost of such transportation by said railway or said company whenever such transportation shall extend from one State into another, or shall extend into more than one State: *Provided, however,* That the rate of such transportation of passengers, local or interstate, shall not exceed the rate above expressed." §§ 1, 4, c. 179, 23 Stat. 73, 74.

The above grant was accepted by the Southern Kansas Railway Company, and the road now controlled by the appellee, the Atchison, Tokepa and Santa Fé Railway Company, in Oklahoma, is operated under that grant. The bill alleged "that ever since the defendant company took over the operation of said line of railway under said grant it had continuously violated the above condition, in that it has charged the inhabitants of said Territory a greater rate of freight than that authorized by the laws of Kansas for services or transportation of the same kind;" and that the company's tariffs of freight charges show in detail said excessive charges. After setting forth the rates charged in Oklahoma and Kansas, respectively, for carrying, for the same distances, lime, cement, plaster, brick, crude oil and refined oil, the bill proceeds: "That the State of Oklahoma at this time has about two million inhabitants, is developing and building towns, villages and individual farmhouses, and that lime, cement, plaster, brick and stone are very essential to its growth; that at this time in the State of Oklahoma there are very large and extensive petroleum oil wells, and the manufacture or refining of the same is an industry continually growing in said State; that the transportation rates on crude and refined oil, lime, cement, plaster, brick and stone are very

important and essential to the development of said State; and, that the violation by said respondent of the said conditions of said grant is a menace to the future of said State." The State further alleged that if the defendant was permitted further to operate the railroad in violation of the condition of the grant it would be a hindrance to the growth of the State, as well as an injury to the property rights of its inhabitants.

The relief asked was that the grant contained in the above act of Congress be canceled and the property granted by it confirmed and decreed to be in the State of Oklahoma as *cestui que trust;* that the defendant be perpetually enjoined and restrained, and, pending the determination of this action, be enjoined and restrained from charging the inhabitants of the State of Oklahoma a greater rate of freight than that authorized by the laws of Kansas for services or transportation of the same kind, and from charging "for lime, cement, plaster, brick, stone, crude and refined oil, the rates specified" in its tariff in so far as the same are greater than those authorized for like transportation by the laws of Kansas until the determination of this cause; and that for the continual violation of the terms of the grant it be perpetually enjoined and restrained from operating a railroad in the state of Oklahoma. The bill also contains a prayer for such further or different relief as may be required by the nature of the case and be agreeable to equity and good conscience.

The railroad company filed a demurrer upon the ground that the bill did not show that the State was entitled to the relief asked nor set forth any controversy between the State and the defendant within the original jurisdiction of this court.

The difficulty in the way of granting the relief asked by the State is, in our judgment, insurmountable. The act of 1884 appears to have had in view, primarily, the protection of the inhabitants of the Indian *Territory* from being

charged unreasonable rates by the railway company when using its right of way through that Territory. Congress undoubtedly supposed that it would be safe, at least for a time, to adopt as a test of the reasonableness of rates in Oklahoma, on domestic shipments, those which Kansas had prescribed as between its people and the corporation it had created; in other words, the inhabitants of the *Territory* were to have the same rights, in respect to railroad rates, as Kansas had prescribed for its corporations and people. But that the railway company might not act unjustly towards the inhabitants of the Territory, Congress reserved the right to regulate charges to be made by the railway company for freight and passengers transported on the railway in question. This, of course, Congress could have done without regard to any rates allowed by or in Kansas at any particular time; for, while the *territorial* conditions lasted, the governmental power of Congress over the Territory and its inhabitants was exclusive and paramount, there being no restrictions upon the exercise of that power, except such as were imposed by the Supreme Law of the Land. It is to be observed, however, that the regulations prescribed by the act of Congress were to exist and be in force "*until* a *State* government or governments shall exist in said Territory within the limits of which said railway or a part thereof shall be located; and *then* such *State* government or governments shall be authorized to fix and regulate the cost of transportation of persons and freight within their respective limits by said railway." So, when Oklahoma was organized as a State and admitted into the Union "on an equal footing with the original States" (34 Stat. 267, 271, § 4, pt. 1) the clause in the act of 1884, prescribing the Kansas rates as the test for rates that might be charged against the inhabitants of the Territory, necessarily ceased to be of any force in the State, and the whole subject of rates in domestic or local business passed under the full control of

the *State* in its corporate capacity, subject, of course, to the fundamental condition that it should authorize only such rates as were legal and not inconsistent with the constitutional rights of the railway company.   If after Oklahoma became a State the company still charged the Kansas rates on local business in Oklahoma, and if those rates would have been illegal under any state regulations, or were, in themselves, unreasonable and purely arbitrary, a controversy, in the constitutional sense, would have arisen between each shipper and the company, which could have been determined by suit brought by the shipper in the proper state court, or even in the proper Federal court, where the controversy, by reason of the grounds alleged by the shipper, was one of which the latter court, under the statutes regulating the jurisdiction of the Federal courts, could take judicial cognizance.   But, plainly, the *State*, in its corporate capacity, would have no such interest in a controversy of that kind as would entitle it to vindicate and enforce the rights of a particular shipper or shippers, and, incidentally, of all shippers, by an original suit brought in its own name, in this court, to restrain the company from applying the Kansas rates, as such, to shippers generally in the local business of Oklahoma. The opposite view must necessarily rest upon the ground that the Constitution when conferring *original* jurisdiction on this court "in all cases affecting ambassadors and other public ministers and consuls *and those in which a State is a party*" (Art. III, § 1), intended to include any and every judicial proceeding of whatever nature which the State may choose to institute, in this court, for the purpose of enforcing its laws, although the State may have no direct interest in the particular property or rights immediately affected or to be affected by the alleged violation of such laws.   In the present case, the State seeks to enjoin the defendant company from charging more than the Kansas rates on the transportation of lime, cement,

plaster, brick, stone, crude and refined oil.  But the State, as such, in its governmental capacity, is not engaged in their sale or transportation, and has no property interest in such commodities.  It seeks only, as between the railway company and shippers, by a general, comprehensive decree to enforce certain rates and to compel the railway company to respect the rights of *all* of the people of Oklahoma who may have occasion to ship such commodities over the railway.

Upon this general subject the case of *Louisiana* v. *Texas*, 176 U. S. 1, is instructive.  The State of Louisiana, by an original suit in this court against the State of Texas, her Governor and Health Officer, sought to restrain the latter State from enforcing by its officers certain quarantine regulations it had established, which Louisiana alleged were illegal and discriminative against it and injurious to the trade and business of its people, particularly interstate commerce as conducted between New Orleans and Texas.  There was a demurrer to the bill upon these grounds: 1. That, within the meaning of the Constitution of the United States, the controversy was not one between Louisiana and Texas.  2. That the controversy was between Texas or her officers and certain persons in Louisiana engaged in interstate commerce, and did not concern Louisiana as an aggregate, corporate body or State.  3. That by the suit brought in this court, Louisiana was only lending its name to certain individuals in New Orleans, who were the real parties in interest. 4. That it appeared from the face of the bill that "the State of Louisiana, in her right of sovereignty, is seeking to maintain this suit for the redress of the supposed wrongs of her citizens in regard to interstate commerce, while under the Constitution and laws the said State possesses no such sovereignty as empowers her to bring an original suit in this court for such purpose."  5. That "no property right of the State of Louisiana is in any manner af-

fected by the quarantine complained of, nor is any such property right involved in this suit as would give this court original jurisdiction of this cause."

This court, speaking by Chief Justice Fuller, after referring to the provisions of the Constitution enumerating the cases and controversies to which the judicial power of the United States extended and of which the Circuit Courts of the United States could take original cognizance, and to numerous adjudged cases, said: "In order then to maintain jurisdiction of this bill of complaint as against the State of Texas, it must appear that the controversy to be determined is a controversy arising directly between the State of Louisiana and the State of Texas, and not a controversy in the vindication of grievances of particular individuals. . . . Inasmuch as the vindication of the freedom of interstate commerce is not committed to the State of Louisiana, and that State is not engaged in such commerce, the cause of action must be regarded not as involving any infringement of the powers of the State of Louisiana, or any special injury to her property, but as asserting that the State is entitled to seek relief in this way because the matters complained of affect her citizens at large. Nevertheless if the case stated is not one presenting a controversy between these States the exercise of original jurisdiction by this court as against the State of Texas cannot be maintained. . . . But in order that a controversy between States, justiciable in this court, can be held to exist, something more must be put forward than that the citizens of one State are injured by the maladministration of the laws of another. The States cannot make war, or enter into treaties, though they may, with the consent of Congress, make compacts and agreements. When there is no agreement, whose breach might create it, a controversy between States does not arise unless the action complained of is state action, and acts of state officers in abuse or excess of their powers cannot be laid

hold of as in themselves committing one State to a distinct collision with a sister State."

These doctrines, we think, control this case and require its dismissal as not being within the original jurisdiction of this court as defined by the Constitution. Under a contrary view that jurisdiction could be invoked by a State, bringing an original suit in this court against foreign corporations and citizens of other States, whenever the State thought such corporations and citizens of other States were acting in violation of its laws to the injury of its people generally or in the aggregate; although, an injury, in violation of law, to the property or rights of particular persons through the action of foreign corporations or citizens of States could be reached, without the intervention of the State, by suits instituted by the persons directly or immediately injured.

We are of opinion that the words, in the Constitution, conferring original jurisdiction on this court, in a suit "in which a State shall be a party," are not to be interpreted as conferring such jurisdiction in every cause in which the State elects to make itself strictly a party plaintiff of record and seeks not to protect its own property, but only to vindicate the wrongs of some of its people or to enforce its own laws or public policy against wrongdoers, generally.

Other questions of interest and importance have been elaborately discussed by counsel, but we deem it unnecessary to extend this opinion by an examination of them. What has been said is quite sufficient to show that the demurrer is well taken and that the bill must, in any event, be dismissed for want of jurisdiction in this court to entertain it by original suit on behalf or in the name of the State.

*Dismissed.*