**STATE OF CALIFORNIA, By and Through its DEPARTMENT OF FISH AND GAME, Plaintiff,**

v.

**S.S. BOURNEMOUTH, Lloyds Registry Number 516-2504, Official Number 720, her engines, tackle, apparel, furniture and equipment, Defendant.**

Civ. No. 69-1994-F.

United States District Court, C. D. California.

Oct. 12, 1970.

---

---

Thomas C. Lynch, Atty. Gen., David B. Stanton, Deputy Atty. Gen., Los Angeles, Cal., for plaintiff.

Lillick, McHose, Wheat, Adams & Charles, Michael D. Dempsey, Los Angeles, Cal., for defendant.

## MEMORANDUM OF OPINION

FERGUSON, District Judge.

The plaintiff, State of California, by and through its Department of Fish and Game, brought this action in admiralty against the defendant vessel, S.S. Bournemouth, for damages resulting from an oil spill in Long Beach Harbor. An earlier opinion of this court held that there was jurisdiction, and that plaintiff's complaint stated a cause of action giving rise to a maritime suit in rem against the ship. 307 F.Supp. 922 (D.C., 1969).

The Liberian vessel, S.S. Bournemouth, inbound from Japan, docked in Long Beach Harbor just after midnight on October 3, 1969. At approximately 10:00 A.M. of that day Captain Walter Putman of the California Department of Fish and Game was called to investigate an oil spill in the east basin of Long Beach Harbor. At this time the oil was floating in the water approximately 700 feet from the Bournemouth. As part of his investigation, Captain Putman boarded the ship and took a sample of the oil from the ship's bunker. This oil had been obtained in Japan. At the time he boarded the ship he did not notice any oil in the water near the ship.

Later that same day a representative of the California Department of Fish and Game boarded the Bournemouth and requested payment for the expenses of cleaning up the oil. The captain denied that the oil came from the Bournemouth and refused to pay for the cleanup. The vessel was then seized by federal marshals and subsequently released upon posting a bond. The State undertook the oil cleanup at a cost of $7,900.32.

Two factual issues are presented to the court by this case: (1) whether the Bournemouth was the source of the oil spill; and (2) if the Bournemouth was the source of the spill, whether it was caused by the intentional or negligent acts or omissions by the vessel and its crew.

A determination of whether the Bournemouth was the source of the spill must proceed on two separate planes. The first involves an analysis of the location of the spill with relation to the ship in light of the harbor currents, tide fluctuations and prevailing winds. The evidence on this issue primarily centered around the testimony of Captain Putman, who has investigated more than one thousand similar spills during the 21 years he has worked in this area of the harbor.

The tide fluctuations in the east basin of the harbor are almost solely up and down and result in little, if any, horizontal movement. Similarly the currents

here are minimal and would have little effect upon the movement of the oil spill. Thus, wind is the primary factor in this analysis. Weather reports were introduced from two points: (a) Long Beach Airport, which is approximately eight miles from the scene of the spill; and (b) a lighthouse which is approximately four miles away. However, these two reports differed considerably, and the wind variations within the general harbor area are so great that these rather distant measurements are of little value.

At 10:00 A.M. on October 3, the wind at the scene of the spill was blowing from slightly west of south at approximately three knots. The oil spill was 700 feet directly downwind from the Bournemouth. Except for the Bournemouth, there was no ship activity in this general area from approximately 6:30 P.M. on October 2 to the time of the discovery of the spill.

This evidence, taken by itself, would probably not support a conclusion that the oil came from the Bournemouth. However, it must be considered in conjunction with the chemical analysis of the oil samples which is the second plane of the analysis of this issue. As part of the investigation, samples of oil taken from the harbor were compared with samples of the Japanese oil taken from the bunker of the Bournemouth. Three different comparative tests were conducted by Mr. Henry Espoy, an expert relied upon by both defense and plaintiff for the purpose of analyzing the samples. While no scientific test presently available can conclusively prove that the two samples are the same, the results of the three tests utilized, when taken together, indicate a scientific probability that the two samples are from the same source.

On the basis of the twofold analysis set forth above, the court finds in favor of the plaintiff with regard to the first issue. The second issue presented is whether the oil spill was caused by the intentional or negligent acts or omissions of the defendant's crew. Plaintiff relies upon *res ipsa loquitur* to establish this element. Defendant argues that plaintiff cannot prevail since there was no direct proof on this issue, and further contends that the doctrine of *res ipsa loquitur* cannot cure this deficiency.

■ Factually, this case presents an appropriate situation for the application of *res ipsa loquitur*. All of the traditional elements are present. Based upon the depositions of the ship's crew members, it is clear that an oil spill of this size could occur only in an extremely limited number of ways—primarily as the result of pumping the bilges or an internal fuel oil transfer. Due to the mechanical design of the fuel oil system, it is also clear that none of these occurrences could take place in the absence of certain intentional or negligent acts and omissions by members of the crew. Thus, one must conclude that oil spills of this type would not ordinarily occur unless someone has been negligent. This establishes the first element of *res ipsa loquitur*.

The second element is that other causes which might be responsible, including the conduct of the plaintiff and third persons, have been sufficiently eliminated by the evidence. This element is established by the court's determination that the oil did, in fact, come from the Bournemouth. There is no suggestion in the case that the State in any way contributed to the oil spill. The third and final element required is that the specific instrumentality was under the exclusive control of the defendant. This is clearly the case here.

The theory of *res ipsa loquitur* as an evidentiary device has been repeatedly accepted in admiralty cases. Johnson v. United States, 333 U.S. 46, 68 S.Ct. 391, 92 L.Ed. 468 (1948); United Fruit Co. v. Marine Terminals Corp., 376 F.2d 1007 (9th Cir. 1967). However, defendant contends that while *res ipsa loquitur* does apply to admiralty cases, the evidentiary effect is considerably different and thus will not support a decision for the plaintiff in this case. In support of this proposition, counsel cites Sweeney v.

Erving, 228 U.S. 233, 33 S.Ct. 416, 57 L.Ed. 815 (1913), and Johnson v. United States, 333 U.S. 46, 68 S.Ct. 391 (1948).

In *Sweeney*, the Court stated that:

"[*R*]*es ipsa loquitur* means that the facts of the occurrence warrant the inference of negligence, not that they compel such an inference; that they furnish circumstantial evidence of negligence where direct evidence of it may be lacking, but it is evidence to be weighed, not necessarily to be accepted as sufficient; that they call for explanation or rebuttal, not necessarily that they require it; that they make a case to be decided by the jury, not that they forestall the verdict." 228 U.S. at 240, 33 S.Ct. at 418.

*Johnson* involved, in large part, an application of the *Sweeney* standards, and for this reason the facts of the case are especially important. While two seamen were working together, a block held by one fell and injured the other. As in the present case, the plaintiff did not produce any evidence of the actual cause of the accident. Nevertheless, the Supreme Court held that the trial court was warranted, under the rule of *res ipsa loquitur*, in finding that the injury resulted from the negligence of the fellow seaman. Again, the Court noted that *res ipsa loquitur* means that "the facts of the occurrence warrant the inference of negligence". 333 U.S. at 48, 68 S.Ct. at 393.

■ The court concludes that the doctrine of *res ipsa loquitur* does apply to the present case, and that based on all the evidence before the court the plaintiff should prevail.

Pursuant to Rule 52 of the Federal Rules of Civil Procedure, this memorandum of opinion shall constitute the findings of fact and conclusions of law of the court.

Pursuant to Rule 58, a judgment shall be separately entered in favor of the plaintiff and against the defendant in the sum of $7,900.32, with costs to the plaintiff.