STATE OF MAINE et al., Plaintiffs,

v.

M/V TAMANO et al., Defendants and
Third-Party Plaintiffs,

v.

UNITED STATES of America,
Third-Party Defendants.

Civ. No. 13–114.

United States District Court,
D. Maine, S. D.

April 26, 1973.

Jon A. Lund, Atty. Gen., E. Stephen Murray, Asst. Atty. Gen., Environmental Protection Div., Augusta, Me., for plaintiffs.

John F. O'Connell and Joseph C. Smith, New York City, Roger A. Putnam and John A. Mitchell, Portland, Me., for Portland Pilots and Capt. Dunbar.

Thomas R. McNaboe, James P. Lansing and Benjamin Thompson, Portland, Me., for M/V TAMANO.

Peter Mills, U. S. Atty., Portland, Me., Emmett B. Lewis and Allen van Emmerik, Admiralty and Shipping Section, Dept. of Justice, Washington, D. C., for U.S.A.

## OPINION AND ORDER OF THE COURT

GIGNOUX, District Judge.

■ The State of Maine and the Board of Environmental Protection, an agency of the State, have brought this suit to recover damages incurred as a result of the discharge into the waters of Casco Bay of approximately 100,000 gallons of Bunker C oil from the tanker M/V TAMANO early on the morning of July 22, 1972, when she struck an outcropping of "Soldier Ledge" while passing through Hussey Sound en route to the port of Portland.[1] Plaintiffs seek to recover damages in three distinct categories: (1) the State in its proprietary capacity seeks to recover for damage to property, such as state parks, which the State itself owns, including the land under the waters of the marginal seas of the State;[2] (2) the Board, by virtue of

1. The present suit is one of five arising out of the spill which have been filed in this Court against the TAMANO, her owners, her captain, and various other defendants. Four class actions have also been filed, two on behalf of owners of shore property, boat owners, and commercial fishermen; and one each on behalf of business establishments and commercial clam diggers, alleged to have been damaged by the spill. All actions assert liability on theories of negligence, unseaworthiness, trespass, and nuisance, and invoke the admiralty and diversity jurisdiction of this Court. In addition, the TAMANO interests have filed a separate action against the United States, alleging, *inter alia,* negligence of the Coast Guard in locating a buoy. Defendants have also joined the United States as a third-party defendant in the present action.

2. The State's claim to ownership of the land under the waters of its marginal seas is based upon the Submerged Lands Act of 1953, 43 U.S.C. § 1301 et seq., which grants title to the states to all lands lying beneath navigable waters within three miles of the coastline.

The State's complaint also includes a claim for damages to waters and marine life beyond the three-mile limit, but it has agreed that any determination of whether it has a cause of action with respect to such waters be contingent upon a showing at trial that some actual damage occurred as a result of the oil spill more than three miles from the coastline. Presently pending in the Supreme Court is an original action instituted by the United States against Maine and other Atlantic coastal states asserting exclusive federal title to all waters beyond the three-mile limit. United States v. Maine, No. 35, Orig. (U.S., motion to file complaint granted, 395 U.S. 955, 89 S.Ct. 2095, 23 L.Ed.2d 743 (1969)) (special master appointed, 398 U.S. 947, 90 S.Ct. 1864, 26 L.Ed.2d 286 (1970)).

the authority granted it by the Maine Oil Discharge Prevention and Pollution Control Act, 38 M.R.S.A. § 541 et seq. (1972 Supp.) sues to recover all sums expended or to be expended by it in payment of third-party damage claims and clean-up costs;[3] and (3) the State in its *parens patriae* capacity "as owner and/or trustee for the citizens of the State of Maine of all of the natural resources lying in, on, over, under and adjacent to" its coastal waters seeks to recover for damage to such waters and the marine life therein. Defendants concede that plaintiffs have valid causes of action with respect to the first two categories, but they contest that the State has stated a viable claim as to the third, and have moved to dismiss the complaint to that extent. Their assertion is essentially that the State has no sufficiently independent interest in its coastal waters and their marine life to permit it to sue as *parens patriae* on behalf of its citizens. The Court disagrees.

Suits by a State, *parens patriae*, have long been recognized. Thus the Supreme Court has entertained suits *parens patriae* to enjoin the discharge of sewage into the Mississippi River, Missouri v. Illinois, 180 U.S. 208, 21 S.Ct. 331, 45 L.Ed. 497 (1901); to restrain the diversion of water from an interstate stream, Kansas v. Colorado, 206 U.S. 46, 27 S.Ct. 655, 51 L.Ed. 956 (1907); to prevent a copper company from discharging noxious fumes across a state border, Georgia v. Tennessee Copper Co., 206 U.S. 230, 27 S.Ct. 618, 51 L.Ed. 1038 (1907); to enjoin the discharge of sewage into New York harbor, New York v. New Jersey, 256 U.S. 296, 41 S.Ct. 492, 65 L.Ed. 937 (1921); to preclude restraints on the commercial flow of natural gas, Pennsylvania v. West Virginia, 262 U.S. 553, 43 S.Ct. 658, 67 L.Ed. 1117 (1923); to restrain drainage changes increasing the flow of water in an interstate stream, North Dakota v. Minnesota, 263 U.S. 365, 44 S.Ct. 138, 68 L.Ed. 342 (1923); and to enjoin alleged discriminatory freight rates charged by railroad companies to the State and its citizens, Georgia v. Pennsylvania R. Co., 324 U.S. 439, 65 S.Ct. 716, 89 L.Ed. 1051 (1945).[4]

■■ These cases establish that the right of a State to sue as *parens patriae*

---

*See* United States v. Louisiana, 363 U.S. 1, 80 S.Ct. 961, 4 L.Ed.2d 1025 (1960) and 364 U.S. 502, 81 S.Ct. 258, 5 L.Ed. 2d 247 (1960).

3. The Maine Oil Discharge Prevention and Control Act was enacted by the Maine Legislature in 1970 in an attempt to establish a comprehensive scheme for the prevention and control of oil pollution of Maine's coastal waters. Laws of Maine of 1970, ch. 572 (1970). The Act creates the Maine Coastal Protection Fund, to be financed by license fees paid by the oil industry, and provides for the payment from the Fund by the Board of Environmental Protection of the claims of persons suffering damage from the discharge of oil and of the costs involved in the abatement of pollution resulting from the discharge of oil. The Act imposes unlimited liability without fault upon offending vessels and terminal facilities, and directs the Board to recover all sums expended from the Fund from the person responsible for the discharge.
The constitutionality of the Act is presently under attack in the Supreme Judicial Court of Maine, Portland Pipeline Corp.

v. Environmental Improvement Comm'n, Law Ct. No. 709 (Me., filed Jan. 24, 1972); American Oil Co. v. Environmental Improvement Comm'n, Law Ct. No. 710 (Me., filed Jan. 31, 1972) (argued May 3, 1972). The constitutionality of a similar Florida statute has just been upheld by the United States Supreme Court. Askew v. American Waterways Operators, Inc., 409 U.S. 892, 93 S.Ct. 110, 34 L.Ed.2d 149 (1973). Should the Maine statute be declared unconstitutional, the Board's claim under it in the present case would, of course, also fall.

4. The question before the Supreme Court in the cited cases was whether the State had standing to invoke the original jurisdiction of the Supreme Court under Article III, Section 2 of the Constitution, which confers original jurisdiction on the Court of suits between States or by one State against a citizen of another State. In each of these cases, the Court determined that the State had properly stated a claim as *parens patriae* and hence was bringing its action on its own behalf and not on behalf of particular citizens.

is not limited to suits to protect only its proprietary interests; a State also may maintain an action *parens patriae* on behalf of its citizens to protect its so-called "quasi-sovereign" interests. Hawaii v. Standard Oil Co. of California, 405 U.S. 251, 258, 92 S.Ct. 885, 31 L.Ed. 2d 184 (1972); Georgia v. Pennsylvania R. Co., *supra* 324 U.S. at 447, 65 S.Ct. 716. A quasi-sovereign interest must be an interest of the State "independent of and behind the titles of its citizens," Georgia v. Tennessee Copper Co., *supra,* 206 U.S. at 237, 27 S.Ct. at 619; that is, in order to maintain a *parens patriae* suit, the State "must show a direct interest of its own and not merely seek recovery for the benefit of individuals who are the real parties in interest." Oklahoma v. Cook, 304 U.S. 387, 396, 58 S.Ct. 954, 958, 82 L.Ed. 1416 (1938).[5]

■ It is clear that Maine has an independent interest in the quality and condition of her coastal waters. It has long been established by decisions of the Supreme Court, and of the Supreme Judicial Court of Maine, that a State has sovereign interests in its coastal waters and marine life, as well as in its other natural resources, which interests are separate and distinct from the interests of its individual citizens. In McCready v. Virginia, 94 U.S. 391, 24 L.Ed. 248 (1876), the Supreme Court stated:

The principle has long been settled in this court, that each State owns the beds of all tide-waters within its jurisdiction, unless they have been granted away. In like manner, the States own the tide-waters themselves, and the fish in them, so far as they are capable of ownership while running. For this purpose the State represents its people, and the ownership is that of the people in their united sovereignty. *Id.* at 394 (citations omitted).

*See also* Geer v. Connecticut, 161 U.S. 519, 529, 534, 16 S.Ct. 600, 40 L.Ed. 793 (1896). More recently, in Toomer v. Witsell, 334 U.S. 385, 68 S.Ct. 1156, 92 L.Ed. 1460 (1948), Mr. Justice Frankfurter, joined by Mr. Justice Jackson, concurring, reaffirmed the continued vitality of *McCready* and described the foundation of the State's power to protect its natural resources as follows:

A State may care for its own in utilizing the bounties of nature within her borders because it has technical ownership of such bounties or, when ownership is in no one, because the State may for the common good exercise all the authority that technical ownership ordinarily confers. *Id.* at 408, 68 S.Ct. at 1168.[6]

Similarly, the Maine Court has repeatedly declared the sovereign interests of the State in its coastal waters. In State

---

5. When the Supreme Court has found that a State was not suing in its own behalf, but was actually suing to recover for injuries to designated individuals, it has denied leave to sue as *parens patriae*: Oklahoma v. Cook, *supra* (State, pursuant to a state statute, sought to enforce claims of creditors and depositors of an insolvent bank); Oklahoma v. Atchison, T. & S. F. R. Co., 220 U.S. 277, 31 S.Ct. 434, 55 L.Ed. 465 (1911) (State sought to recover damages allegedly resulting from unlawful freight rates charged to certain of its citizens); Louisiana v. Texas, 176 U.S. 1, 20 S.Ct. 251, 44 L.Ed. 347 (1900) (State sought to enjoin interference with interstate commerce resulting from State quarantine regulations); New Hampshire v. Louisiana, 108 U.S. 76, 2 S.Ct. 176, 27 L.Ed. 656 (1883) (State sought to collect claims of certain

of its citizens who held bonds of other States, which claims had been assigned to the plaintiff State).

6. The majority opinion in Toomer v. Witsell, without expressly overruling *McCready*, cast doubt on the "ownership" theory of that case, which it regarded as but a legal fiction. 334 U.S. at 402, 68 S.Ct. 1156, 92 L.Ed. 1460. *See also* Missouri v. Holland, 252 U.S. 416, 434, 40 S.Ct. 382, 64 L.Ed. 641 (1920). The *Toomer* majority explicitly recognized, however, the interest of the State as trustee for its citizens of its natural resources and "the importance to its people that a State have power to preserve and regulate the exploitation of an important resource." 334 U.S. at 402, 68 S.Ct. at 1165.

v. Peabody, 103 Me. ·327, 69 A. 273 (1907), the court stated:

> It is a well settled principle of the common law that the fish in the waters of the state, including the sea within its limits as well as the game in its forests belong to the people of the State in their collective sovereign capacity. *Id.* at 330, 69 A. at 274.

And again, in State v. Leavitt, 105 Me. 76, 72 A. 875 (1909), the court affirmed the State's sovereign interests in the waters along its coast:

> It is, therefore, settled law that each State, unless it has parted with title . . . owns the bed of all tidal waters within its jurisdiction, and as well, the tide waters themselves and the fish in or under them, so far as they are capable of ownership. For this purpose the State represents the people in their united sovereignty. The right which the people thus acquire comes not from their citizenship alone, but from their citizenship and property combined. It is in fact a property right . . . . *Id.* at 79, 72 A. at 877.

*See also* State v. Ruvido, 137 Me. 102, 15 A.2d 293 (1940); State v. Lemar, 147 Me. 405, 87 A.2d 886 (1952); State v. Alley, 274 A.2d 718 (Me.1971).

■ Defendants further urge that in order to maintain a *parens patriae* action, the State must also show that the damage to its coastal waters has an adverse effect upon a substantial part of its citizens, *see* Hawaii v. Standard Oil Co. of California, 301 F.Supp. 982 (D. Haw.1969), rev'd on other grounds, 431 F.2d 1282 (9th Cir. 1970), aff'd, 405 U. S. 251, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972). Whether or not this is a requirement, *see* Note, State Protection of Its Economy and Environment: Parens Patriae Suits for Damages, 6 Col.J.Law & Soc.Prob. 411, 418 (1970), it is plainly met here. The conclusion is inescapable that if injury to Maine's coastal waters and marine life has occurred as a result of this spill, the environment of the State and the recreational opportunities and welfare of all her citizens have seriously suffered. In the words of Georgia v. Pennsylvania R. Co., *supra,* 324 U.S. at 451, 65 S.Ct. at 723, "[t]hese are matters of grave public concern in which [Maine] has an interest apart from that of particular individuals who may be affected. [Maine's] interest is not remote; it is immediate." *See also* Georgia v. Tennessee Copper Co., *supra,* 206 U.S. at 238, 27 S.Ct. 618; Kansas v. Colorado, *supra,* 206 U.S. at 99, 27 S.Ct. 655; Missouri v. Illinois, *supra,* 180 U.S. at 241, 21 S.Ct. 331.

■ Defendants argue finally that the State cannot maintain a *parens patriae* suit for damages. They correctly observe that all but two of the Supreme Court *parens patriae* cases were actions for solely injunctive relief. And it is true that in both of its *parens patriae* damages suits, the Supreme Court denied recovery: in Georgia v. Pennsylvania R. Co., *supra,* involving a conspiracy to fix railroad rates, because the allegedly collusive rates had been approved by the Interstate Commerce Commission and a damage award would have constituted an improper rebate, *id.,* 324 U.S. at 453, 65 S.Ct. 716, in Hawaii v. Standard Oil Co. of California, *supra,* a civil antitrust case, because the Court held that Section 4 of the Clayton Act does not authorize damages for an injury to the general economy of the State, *id.,* 405 U.S. at 264–266, 92 S.Ct. 885. But the plain implication to be drawn from both cases is that, absent some substantive bar, the Court was willing to allow damages to a State suing as *parens patriae.* *See* Hawaii v. Standard Oil Co. of California, *supra,* 301 F.Supp. at 987; Note, State Protection of Its Economy and Environment, *supra,* at 419–23.

■ Defendants point out that there is a risk of double damages when a State's quasi-sovereign interests are asserted. They also argue that any injury to the State's interests is too speculative to be reduced to money damages. The latter is a problem of proof to be met at trial. *Cf.* Hawaii v. Standard Oil

Co. of California, *supra,* 301 F.Supp. at 988. Nor does permitting the State to sue *parens patriae* "necessarily lead to double recovery. Since [Maine] is by definition asserting claims 'independent of and behind the titles of its citizens,' Georgia v. Tennessee Copper Co., 206 U. S. 230, 237, 27 S.Ct. 618, 619, 51 L.Ed. 1038 (1907), there may be excluded from its recovery any monetary damages that might be claimed by her citizens individually or as part of a properly constituted class. That problem, like uncertainty of damages, is better answered after trial than on the pleadings." Hawaii v. Standard Oil Co. of California, *supra,* 405 U.S. at 276–277, 92 S.Ct. at 898 (Brennan, J., dissenting).

In sum, this Court agrees with the District Court in the *Standard Oil* case that "[t]here is no merit in defendants' claim that there can never be a *parens patriae* suit for damages." 301 F.Supp. at 987. Indeed, two lower federal courts, in cases substantially identical to the instant one, have recently permitted a State to bring a damage claim in a *parens patriae* capacity for injury to its waters and marine life allegedly resulting from marine oil spills. Maryland v. Amerada Hess Corp., 350 F.Supp. 1060 (D.Md.1972); California v. S. S. Bournemouth, 307 F.Supp. 922 and 318 F. Supp. 839 (C.D.Cal.1970). As the court observed in the *Bournemouth* case,

> Oil pollution of the nation's navigable waters by seagoing vessels both foreign and domestic is a serious and growing problem. The cost to the public, both directly in terms of damage to the water and indirectly of abatement is considerable. In cases where it can be proven that such damage to property does in fact occur, the governmental agencies charged with protecting the public interest have a right of recourse . . . against the offending vessel for damages to compensate for the loss. 307 F.Supp. at 929.

If Maine can establish damage to her quasi-sovereign interests in her coastal waters and marine life, independent of whatever individual damages may have been sustained by her citizens, there is no apparent reason why the present action to recover such damage cannot be maintained. In the view of this Court, the complaint states a viable *parens patriae* cause of action, which cannot be dismissed at this stage.

Defendants' motion to dismiss is denied.

It is so ordered.