Merrimack
No. 2005-552

THE STATE OF NEW HAMPSHIRE

v.

CITY OF DOVER & a.

Argued: October 19, 2005
Opinion Issued: January 18, 2006

*Kelly A. Ayotte*, attorney general (*Maureen D. Smith*, senior assistant attorney general, on the brief and orally), for the State.

*Watson & Lemire, P.A.*, of Portsmouth (*Thomas R. Watson* and *Jennifer A. Lemire* on the brief, and *Mr. Watson* orally), for the defendants.

DUGGAN, J. The defendants, the Cities of Dover and Portsmouth (cities), appeal a decision by the Superior Court (*Fitzgerald*, J.) that suits filed by the cities against certain manufacturers, suppliers and distributors of methyl tertiary butyl ether (MTBE) must yield to suits filed by the State of New Hampshire against MTBE manufacturers, suppliers and distributors. We affirm.

The record reflects the following stipulated facts. MTBE was first added to gasoline in the late 1970's. Manufacturers of MTBE claim that adding MTBE to gasoline boosts octane levels and produces a cleaner burning fuel, which is less likely to produce airborne pollutants. Following the passage of the Clean Air Act of 1990, 42 U.S.C. §§ 7401-7671, addition of MTBE to gasoline became widespread in order to combat air pollution. MTBE, however, is more soluble than other gasoline components, and thus spreads more easily into water supplies, the water table and underground aquifers. Since 1990, numerous governmental and private plaintiffs have

sued MTBE producers and distributors on a number of theories of liability, including negligent water pollution and strict product liability.

On September 30, 2003, the State, through the office of the attorney general, brought suit in the superior court against thirty out-of-state MTBE and gasoline designers, manufacturers and refiners alleging that MTBE had polluted the State's ground and surface waters. On October 16, 2003, the attorney general distributed a memorandum to all public water suppliers in the State, including the cities, informing them of the State's suit, its purpose, remedies sought, and that separate suits by public water suppliers would be considered duplicative.

On October 24, 2003, the City of Portsmouth filed an action in the superior court against sixty-one MTBE and gasoline manufacturers and distributors, including various in-state entities not sued by the State. On November 19, 2003, the City of Dover filed a similar action in the superior court against the same sixty-one defendants.

The State's suit alleged the following seven causes of action: (1) strict product liability for defective design; (2) strict product liability based upon failure to warn; (3) public nuisance; (4) strict liability under RSA chapters 146-A (2005) and 146-G (2005 & Supp. 2005); (5) trespass; (6) negligence; and (7) unfair or deceptive business acts in violation of the Consumer Protection Act, RSA 358-A:2 (Supp. 2005). The cities' suits allege the same causes of action as well as civil conspiracy and private nuisance. Both the State and the cities seek injunctive and equitable relief, compensatory damages for costs resulting from contamination, punitive damages, and costs.

All three suits were removed to the United States District Court for the Southern District of New York and consolidated with other MTBE cases from around the country. Both the State and the cities moved to remand the cases to State court. The district court denied the motions. The State has appealed this ruling to the United States Court of Appeals for the Second Circuit. The defendant MTBE suppliers, distributors and manufacturers moved to dismiss the cities' suits. That motion was granted in part and denied in part. *See In re Methyl Tertiary Butyl Ether Products Liab.*, 379 F. Supp. 2d 348, 420 (S.D.N.Y. 2005).

The State brought this suit in superior court seeking a declaratory judgment that the cities' MTBE suits must be dismissed because New Hampshire law requires that they yield to the State's MTBE suit. The parties sought an interlocutory transfer to this court, which we declined.

On April 1, 2005, the State moved for a declaratory ruling in superior court, asking the court to dismiss the cities' cases. The cities filed a cross-motion for a declaratory ruling that they may concurrently maintain their suits. The trial court ruled that the State had *parens patriae* standing and

that the doctrine of *parens patriae* required the cities' suits to yield to the State's suit.

On appeal, the cities argue the trial court's ruling was erroneous for four reasons: (1) the State has not met the requirements for asserting *parens patriae* standing; (2) even if the State has *parens patriae* standing, the cities have a compelling interest in maintaining separate suits against the MTBE defendants; (3) the ruling contravenes a comprehensive statutory framework, by which the legislature has authorized and directed municipalities to bring MTBE contamination suits; and (4) requiring the cities' suits to yield to the State's suit violates the cities' constitutional right to a certain and complete remedy and the separation of powers doctrine. N.H. CONST. pt. I, arts. 14, 37.

The trial court decided the issue based upon stipulated facts. Because the facts are not in dispute, the issues before us are solely questions of law. *See Benoit v. Test Systems*, 142 N.H. 47, 49 (1997). Accordingly, we review the trial court's application of the law to the facts *de novo*. *See id.* "Because the issues raised involve only New Hampshire law, we decide this case on State law only." *Petition of State of N.H. (Bowman Search Warrants)*, 146 N.H. 621, 624 (2001).

We have never been asked to define the limits of the State's *parens patriae* authority. We have, however, long recognized the State's *parens patriae* interest in the welfare of children, *In re Juvenile 2002-098*, 148 N.H. 743, 747 (2002), and in caring for mentally incompetent persons, *see Opinion of the Justices*, 123 N.H. 554, 560 (1983).

■ "*Parens patriae* literally means 'parent of the country,' and refers traditionally to the role of the state as sovereign and guardian of persons under legal disability." *Massachusetts v. Bull HN Information Systems*, 16 F. Supp. 2d 90, 96 (D. Mass. 1998).

> The *parens patriae* action has its roots in the common-law concept of the "royal prerogative." The royal prerogative included the right or responsibility to take care of persons who are legally unable, on account of mental incapacity, whether it proceed from ... nonage[,] idiocy[, or] lunacy ... to take proper care of themselves and their property.

*Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 600 (1982) (quotation omitted).

> ■ Over time, the meaning of the doctrine has evolved, and *parens patriae* has become a different and far broader sovereign power. Today, it is a concept of standing utilized to allow the state to protect "quasi-sovereign" interests such as the health,

comfort and welfare of its citizens, interstate water rights, and the general economy of the state.

*Bull HN Information Systems*, 16 F. Supp. 2d at 96 (citations omitted).

■ In *Snapp*, the United States Supreme Court articulated the circumstances under which a State has *parens patriae* standing to bring an action. Courts and commentators have distilled the Court's analysis into two parts. *Bull HN Information Systems*, 16 F. Supp. 2d at 96. "First, the state must assert an injury to a 'quasi sovereign' interest, an interest apart from the interests of particular private parties. Second, the state must allege injury to a 'substantial segment' of its population." *Id.*

The Court in *Snapp* defined "quasi-sovereign" interests as "interests that the State has in the well-being of its populace. . . . A quasi-sovereign interest must be sufficiently concrete to create an actual controversy between the State and the defendant." *Snapp*, 458 U.S. at 602. The Court recognized the State's quasi-sovereign interest in "the health and comfort of the inhabitants of a State." *Id.* at 603-04 (quotation omitted). It indicated that States have a quasi-sovereign interest "in the abatement of public nuisances, instances in which the injury to the public health and comfort [is] graphic and direct." *Id.* at 604. "Post-*Snapp* courts have generally interpreted the health and well-being category of quasi-sovereign interests broadly . . . ." *Bull HN Information Systems*, 16 F. Supp. 2d at 97. "A state also has a quasi-sovereign interest in preventing any injury or potential injury to the general health and well-being of its residents." *Id.*

■ Here, the State has a quasi-sovereign interest in protecting the health and well-being, both physical and economic, of its residents with respect to the statewide water supply. "The control and elimination of water pollution is a subject clearly within the scope of the [State's constitutional] police power." *Shirley v. Commission*, 100 N.H. 294, 299 (1956). Moreover, the State's interest is reflected in RSA 481:1 (2001), which provides:

> The state as trustee of [the water of New Hampshire] for the public benefit declares that it has the authority and responsibility to provide careful stewardship over all the waters lying within its boundaries. The maximum public benefit shall be sought, including the assurance of health and safety, the enhancement of ecological and aesthetic values, and the overall economic, recreational and social well-being of the people of the state.

The State's interest in protecting its waters from MTBE contamination is thus "sufficiently concrete" to be a "quasi-sovereign" interest.

The second inquiry under *Snapp* is whether a sufficiently substantial segment of the population is affected by the challenged conduct. *Bull HN Information Systems*, 16 F. Supp. 2d at 98. "This element is not conceptually distinct from the requirement that the state demonstrate a quasi-sovereign interest: both categories ensure that the state is not standing in for individuals in an essentially private dispute." *Id.* at 98-99. This test does not set forth "a definitive numerical threshold for the proportion of the population that must be adversely affected in order for the state to have standing." *Id.* at 99. However, "the State must be more than a nominal party." *Snapp*, 458 U.S. at 607. "Although more must be alleged than injury to an identifiable group of individual residents, the indirect effects of the injury must be considered as well in determining whether the State has alleged injury to a sufficiently substantial segment of its population." *Id.*

■ Here, the attorney general is suing for damages and injunctive relief based upon contamination to all but one county in the State. According to the stipulated record, in 2002, MTBE was present in 13.2% of the statewide water supplies, which corresponds to hundreds of public water systems and approximately 40,000 private water supplies. This data demonstrates that the MTBE contamination has directly affected a substantial portion of the population of New Hampshire. The State has clearly met the "substantial segment" test.

■ The cities argue that the State must meet a third requirement for *parens patriae* standing by showing that "individuals could not obtain complete relief through a private suit." *People of State of N.Y. by Abrams v. 11 Cornwell Co.*, 695 F.2d 34, 40 (2d Cir. 1982), *vacated on other grounds by People of State of N.Y. by Abrams v. 11 Cornwell Co.*, 718 F.2d 22 (2d Cir. 1983). Essentially, the cities ask us to place the burden upon the State to prove that the cities will obtain complete relief through the State's suit. However, we conclude that the burden properly rests upon the cities to show that they cannot obtain complete relief through the State's suit. Placing the burden upon the State would be inconsistent with other decisions that have placed the burden upon municipalities. *See, e.g., New Jersey v. New York*, 345 U.S. 369, 373-74 (1953); *11 Cornwell Co.*, 695 F.2d at 40; *People v. Peter & John's Pump House*, 914 F. Supp. 809, 813 (N.D.N.Y. 1996). Whether or not the cities have met their burden is discussed below.

■ We conclude that the State has demonstrated both a quasi-sovereign interest and that a substantial segment of the population is affected. It

thus has *parens patriae* standing to bring contamination suits against the MTBE defendants on behalf of the residents of New Hampshire.

We turn next to the question of whether, given that the State has *parens patriae* standing, the cities may nonetheless maintain their suits.

In dismissing the cities' suits, the trial court relied upon the test articulated by the Supreme Court in *New Jersey*, 345 U.S. at 372-73. There, the Court denied a motion by the City of Philadelphia to intervene in litigation based upon the original jurisdiction of the Supreme Court, in which the Commonwealth of Pennsylvania was already a party. *Id.* at 375. The Court stated that "the '*parens patriae*' doctrine . . . is a recognition of the principle that the state, when a party to a suit involving a matter of sovereign interest, must be deemed to represent all its citizens." *Id.* at 372 (quotation omitted). The Court held that an intervenor may maintain a suit in the face of a suit by the attorney general if the intervenor could show "some compelling interest in his own right, apart from his interest in a class with all other citizens and creatures of the state, which interest is not properly represented by the state." *Id.* at 373. Applying this test to the instant case, the trial court found that, "the situations are sufficiently analogous that the reasoning advanced in [*New Jersey*] is applicable here." The trial court then concluded that the cities had not demonstrated a compelling interest in the litigation and ruled that the cities' suits must yield to the State's suit.

The cities argue that the trial court erred in relying upon *New Jersey* because the facts here are distinguishable from the facts in that case. They also argue that, even if *New Jersey* is applicable here, the trial court erred in finding that the State's action will adequately protect the cities' interests. The State argues that the cities' interest in protecting their public water supplies is served by the State's litigation and that the causes of action and remedies sought by the cities are subsumed by the State's case.

We first address the cities' argument that the present case is distinguishable from *New Jersey* because, unlike Philadelphia, which sought to intervene in the suit, the cities seek to maintain separate suits. Here, the cities could have sought intervention in the State's suit. *See ACG Credit Co. v. Gill*, 152 N.H. 260, 262 (2005). Instead, they filed separate suits based upon their interest in their respective municipal water supplies. We agree with the trial court that this procedural difference between this case and *New Jersey* is not a material distinguishing factor.

However, we note that the *New Jersey* compelling interest test may apply only in appellate courts exercising original jurisdiction. *See Environmental Defense Fund, Inc. v. Higginson*, 631 F.2d 738, 740 (D.C. Cir. 1979). It has been stated that the "'compelling interest test'

announced in [*New Jersey*] has full vitality for actions in the original jurisdiction of the Supreme Court but not for suits in other courts." *Id.* This is because appellate courts have an interest in avoiding cases which "require the Court to perform the unfamiliar task of fact finding." *Id.* at 739-40. Instead of applying the compelling interest test, *Higginson* held that a person or entity seeking to maintain a separate suit, as the cities here seek to do, must overcome the "presumption of adequate representation. A minimal showing that the representation may be inadequate is not sufficient. The applicant for intervention must demonstrate that its interest is in fact different from that of the state and that that interest will not be represented by the state." *Id.* at 740.

Neither the State nor the cities have addressed the *Higginson* standard or challenged the trial court's application of the compelling interest test. Therefore, for the purposes of this appeal, we address the issue using the compelling interest test.

The cities argue that they have a compelling interest in maintaining separate litigation because the State's suit does not represent their interests. They argue that the State's suit names fewer defendants, fails to allege a number of theories of liability alleged by the cities, fails to seek the remedies sought by the cities, and is subject to defenses based upon the State's history of regulating MTBE which are not applicable to the cities. The cities also point out that the State has promised to use any recovery to establish a public fund to be managed by the attorney general instead of distributing it to cities in accordance with individual damages.

The trial court found that "while the cities contend that the levels of MTBE pollution are greater in their water supplies than in those of other municipalities, such disparity does not present a compelling interest in their own rights, nor does it show that their rights are not properly represented by the State."

We agree with the trial court's finding that "the fact that the Cities and the State have chosen to proceed on different theories and have thus opened themselves up to different defenses does not mean that the State is unable to properly obtain judgment on behalf of the Cities and other affected municipalities." We further agree with the trial court's finding that:

> There is no reason for the Court to conclude, on the facts presented, that the State will not seek to obtain full compensation for all communities, including the Cities. While the compensation sought may not be the same as that which the cities would desire, a difference of that nature does not demonstrate an interest that is not properly represented by the State.

■While the cities may have a direct economic interest in recovering for contamination to their water supplies, this economic interest is represented by the State's suit. Thus, the cities' interests are represented by the State's suit. In the absence of a showing of compelling interest by the cities, we hold that the doctrine of *parens patriae* controls and the cities' suits must yield to the attorney general's suit.

We next address the cities' contention that requiring their suits to yield to the State's suit contravenes a "comprehensive statutory framework" that authorizes and directs municipalities to bring MTBE contamination suits. The cities argue that this statutory framework shows that the legislature intends to allow the cities to maintain MTBE contamination suits even in the face of such a suit by the State. As evidence of this "comprehensive statutory framework," the cities point to provisions in RSA chapter 38 (2000 & Supp. 2005), RSA chapter 485-C (2001 & Supp. 2005) (the Groundwater Protection Act), and RSA chapter 485 (2001 & Supp. 2005) (the Safe Drinking Water Act).

"On questions of statutory interpretation, we are the final arbiter of the intent of the legislature as expressed in the words of a statute considered as a whole." *Appeal of Meunier,* 147 N.H. 546, 548 (2002). We begin by examining the plain meaning of the words used in the statute and consider legislative history only if the statutory language is ambiguous. *Lamy v. N.H. Pub. Utils. Comm'n,* 152 N.H. 106, 108 (2005).

■ The cities argue that RSA 38:30 (2000) confers upon them authority to sue for MTBE contamination. Under RSA 38:30 municipalities are granted "the power to take by the exercise of the right of eminent domain any property needed to protect the purity of water [that it supplies to the public for domestic use], upon petition to the superior court." The purpose of RSA chapter 38 is to empower municipalities to take by eminent domain privately owned electric, gas and water utilities in order to maintain and operate them as publicly owned facilities. RSA 38:2, I, II (2000); *Pennichuck Corp. v. City of Nashua,* 152 N.H. 729, 731 (2005). Neither this provision, nor any other in RSA chapter 38, however, explicitly authorizes municipalities to sue for contamination of public water supplies in the face of such a suit by the State.

■ The cities also point to provisions in the Groundwater Protection Act, RSA chapter 485-C, as part of the alleged "statutory framework" giving municipalities the right and obligation to sue for MTBE contamination. The cities rely specifically upon RSA 485-C:1, II (2001), which states: "Because groundwater is primarily a local resource, cities and towns should have the first opportunity to institute programs for groundwater protection." However, the "first opportunity to institute

programs" does not expressly confer upon municipalities the power to sue for contamination of public water supplies. Moreover, the Groundwater Protection Act clearly does not envision that municipalities should have the right to maintain MTBE contamination suits in the face of such a suit by the State. Rather, it confers upon the State the "general responsibility for groundwater management in the public trust and interest." *Id.*

The cities also argue that the Safe Drinking Water Act, RSA chapter 485, is part of the alleged "comprehensive statutory framework" authorizing municipal suits for MTBE contamination. The cities point to RSA 485:32 (2001), a criminal statute, which provides:

> Any person who shall willfully injure any of the property of any water company or of any city or town, used by it in supplying water to its inhabitants, shall be guilty of a misdemeanor if a natural person, or guilty of a felony if any other person, and such person shall also forfeit and pay to such water company, city or town 3 times the amount of actual damages sustained, to be recovered in an action on the case.

However, criminal prosecutions are subject to the control of the attorney general. *See Bokowsky v. State*, 111 N.H. 57, 58-59 (1971) (the attorney general may enter a *nolle prosequi* in a criminal case commenced by a private plaintiff). This provision does not authorize civil suits in the face of a suit by the attorney general.

The cities argue that RSA 485:18 (2001) authorizes civil suits by municipalities. RSA 485:18 provides:

> The health officer of the town, or the water commissioners having charge of the water supply, or the proprietors of the water supply, may remove [polluting] substance or fluid; and they may recover the expense of removal from the person who placed the same, or caused it to be placed, in or near the water, in an action on the case.

RSA 485:18 applies in limited circumstances. It permits municipalities to recover costs expended in the removal of pollutants from municipal water supplies. *See id.* The provision does not give municipalities a cause of action to seek damages from MTBE contamination. In this case, the cities are suing for damages, not for costs expended in the removal of MTBE.

Moreover, another provision in RSA chapter 485 envisions a preemptive role for the State in protecting public water supplies. Under

RSA 485:20 (2001), municipalities seeking an injunction against pollution shall, at least thirty days prior to commencing an action,

> give notice of any such action to the attorney general and the commissioner of environmental services, who may take such steps as they deem necessary to ensure uniform statewide enforcement, including but not limited to joining the action, assuming sole prosecution of the action, or, as of right, dismissing the action without prejudice.

This provision squarely authorizes the attorney general to assume full responsibility for a case filed by a municipality seeking injunctive relief against a polluter. It is inconsistent with the cities' claim that the statutory framework authorizes the cities to maintain separate suits concerning MTBE contamination in the face of such a suit by the State.

Finally, we address the cities' contentions that the trial court decision violates their constitutional right to a certain and complete remedy and the separation of powers doctrine. First, the cities argue that the trial court's ruling deprives them of a certain and complete remedy for harm done to their municipal water supplies.

Part I, Article 14 of the New Hampshire Constitution provides:

> Every subject of this state is entitled to a certain remedy, by having recourse to the laws, for all injuries he may receive in his person, property, or character; to obtain right and justice freely, without being obliged to purchase it; completely, and without any denial; promptly, and without delay; conformably to the laws.

"The purpose of this provision is to make civil remedies readily available and to guard against arbitrary and discriminatory infringements on access to the courts." *Town of Nottingham v. Newman*, 147 N.H. 131, 134-35 (2001) (quotation omitted). "The right to a remedy, however, is not a fundamental right, but is relative and does not prohibit all impairments of the right of access." *Minuteman, LLC v. Microsoft Corp.*, 147 N.H. 634, 640 (2002) (quotation omitted). "The analytical predicate to any consideration of [whether to recognize a new remedy where none existed before] must be a determination that the relief sought is not obtainable by other existing legal remedies." *Aranson v. Schroeder*, 140 N.H. 359, 364 (1995).

The cities contend that they have been denied a certain and complete remedy for three reasons. First, they argue that they have been denied strategic control over the litigation. Second, they argue that the State's suit fails to seek treble damages under RSA 485:32. Third, the cities argue that they will be denied a certain and complete remedy by the

administration of a statewide trust fund which the attorney general plans to create and oversee using damages recovered from MTBE defendants, if and when such damages are recovered.

We assume without deciding that Article 14 applies to the cities. However, the cities are not denied their Article 14 right to a remedy because they still have legal recourse in this case. Under our ruling, the cities are represented by the State, and the State has brought suit to redress harms from MTBE contamination. The cities have failed to show a sufficient reason why the State cannot adequately represent them and obtain a complete remedy. The cities may still recover treble damages under RSA 485:32 if the attorney general, in her discretion, chooses to prosecute under that statute. The cities may also obtain relief through the State's suit without controlling the strategy of litigation. Thus, the cities, through the State's action, possess all rights guaranteed by the Constitution.

The cities' second constitutional challenge is under the separation of powers doctrine. *See* N.H. CONST. pt. I, art. 37. Here, the cities seem to argue that the attorney general's assertion of paramount authority violates the separation of powers doctrine because the legislature has crafted a comprehensive statutory scheme governing public water supplies that specifically authorizes municipalities to sue for MTBE contamination. We have already rejected the argument that a comprehensive statutory scheme exists. Because this argument is the foundation of the cities' separation of powers argument, we need not address it further.

We hold that the cities' MTBE suits must yield to the State's suit.

*Affirmed.*

BRODERICK, C.J., and DALIANIS and GALWAY, JJ., concurred.