Merrimack
No. 2010-082

STATE OF NEW HAMPSHIRE

v.

HESS CORPORATION & a.

Argued: November 10, 2010
Opinion Issued: January 28, 2011

*Michael A. Delaney*, attorney general (*Mary Maloney*, assistant attorney general, on the brief), *Sher Leff, LLP*, of San Francisco, California (*Victor M. Sher* on the brief), *Law Offices of Matthew F. Pawa, P.C.*, of Newton Centre, Massachusetts (*Matthew F. Pawa* and *Benjamin A. Krass* on the brief, and *Mr. Pawa* orally), for the plaintiff.

*Beveridge & Diamond, P.C.*, of Washington, D.C. (*John S. Guttmann* and *Nessa E. Horewitch* on the brief, and *Mr. Guttmann* orally), and *Devine, Millimet & Branch, P.A.*, of Concord (*Peter G. Beeson* on the brief), for the defendants.

DUGGAN, J. This case comes before us on an interlocutory transfer without ruling from the Superior Court. *See* SUP. CT. R. 9. We accept the facts as presented in the interlocutory transfer. *See In re Kotey M.*, 158 N.H. 358, 359 (2009).

In 1991, New Hampshire applied to the United States Environmental Protection Agency's (EPA) reformulated gasoline (RFG) program. The RFG program, which set specifications for formulating gasoline sold in metropolitan areas with high summertime ozone levels, was established by a 1990 amendment to the Clean Air Act and was intended to reduce

vehicle-related air pollution. The program did not require gasoline manufacturers to utilize any specific oxygenate in reformulating their products. Instead, that decision was left to individual manufacturers.

Although not required to participate in the RFG program, New Hampshire decided to "opt-in." The EPA accepted New Hampshire's application — effective January 1, 1995 — for Rockingham, Hillsborough, Merrimack and Strafford Counties. Thereafter, between 1995 and 2006, gasoline containing methyl tertiary butyl ether (MTBE), which is a chemical compound that has been used as a gasoline additive to increase octane levels of fuel, was sold throughout the state. During this time, the State alleges that MTBE, which it asserts is a known animal carcinogen and probable human carcinogen, escaped into, and contaminated, the groundwater. In 2001, the State petitioned the EPA to opt-out of the RFG program on an expedited basis because of MTBE contamination, and then banned MTBE as a gasoline additive effective January 1, 2007.

The State exercises significant regulatory control over the State's groundwater and drinking water through the New Hampshire Department of Environmental Services (DES) and pursuant to the New Hampshire Safe Drinking Water Act (SDWA). The Commissioner of DES must adopt "primary drinking water standards" for contaminants in drinking water that "may have an adverse effect on the health of persons." RSA 485:3, I(a) (2001). These standards include a maximum contaminant level (MCL), which establishes the maximum amount of a given contaminant that may be present in water for human consumption. RSA 485:3, I(b)(1) (2001). For groundwater, DES must also adopt ambient groundwater quality standards (AGQS) for contaminants that "adversely affect human health or the environment," RSA 485-C:6, I (2001), which must meet drinking water standards, RSA 485-C:1, I (2001). In addition to these standards applicable to all contaminants, the legislature added a section to the SDWA in 1999, which specifically mandates DES to adopt such standards for MTBE. RSA 485:16-a, I (2001).

In 2000, DES, in consultation with the New Hampshire Department of Health and Human Services, established a primary MCL and an equivalent AGQS for MTBE of thirteen parts per billion "based on positive carcinogenic effects observed in experimental animals" reported in the publicly available literature at the time. Additionally, New Hampshire law provides that "[a]ny public water system delivering water with greater than 5 parts per billion of MTBE shall notify each customer of the MTBE content." RSA 485:16-a, II (2001). However, both the MCL for MTBE and the notification requirement apply only to public water systems. RSA 485:3, I, :16-a. The SDWA defines a "public water system" as a "system for the provision to the public of piped water for human consumption, if such system has at least 15

service connections or regularly serves an average of at least 25 individuals daily at least 60 days out of the year." RSA 485:1-a, XV (2001). All other wells, whether privately or publicly owned, that serve more than one individual home but do not qualify as a "public water system" are non-public water systems.

In 2003, New Hampshire and several other states filed suit in their respective state courts against several gasoline suppliers, refiners and chemical manufacturers (MTBE defendants) seeking damages for ground-water contamination allegedly caused by MTBE. The MTBE defendants initially removed New Hampshire's case to federal court, and it was subsequently transferred by the Judicial Panel on Multidistrict Litigation to the Southern District of New York and consolidated with numerous other MTBE lawsuits from around the country. Following the denial of its motion to remand, the State filed an interlocutory appeal with the United States Court of Appeals for the Second Circuit, which reversed and vacated the district court's order in May 2007. *See In re Methyl Tertiary Butyl Ether* (*"MTBE"*), 488 F.3d 112 (2d Cir. 2007). Thus, this case was remanded to Merrimack County Superior Court for trial.

In the meantime, the cities of Dover and Portsmouth brought their own suits against the MTBE defendants. We affirmed the dismissal of these suits in January 2006. *See State v. City of Dover*, 153 N.H. 181 (2006). In that decision, we determined that the State, rather than the two cities, was the proper party to bring suit against the MTBE defendants because it "has a quasi-sovereign interest in protecting the health and well-being, both physical and economic, of its residents with respect to the statewide water supply." *Id.* at 186. We also noted that "MTBE contamination has directly affected a substantial portion" of the State's population. *Id.* at 187. Accordingly, we held that the State had *parens patriae* standing to bring suit against the MTBE defendants on behalf of the residents of New Hampshire. *Id.* at 187-88.

In August 2009, the MTBE defendants in this case filed a motion for partial summary judgment, seeking to prevent the State from recovering damages

> incurred by private individuals or private water supplies, includ-ing, but not limited to: (1) damages related to private property; (2) costs of alternative water supplies incurred by private parties; (3) business losses for any private entity; (4) costs of private treat-ment systems borne by private well owners and private water authorities; (5) increased operating expenses for private water authorities; (6) costs associated with testing/monitoring for MTBE by private parties; (7) costs associated with MTBE

remediation at private wells or utilities that were incurred directly by private parties; and (8) any other similar purely private damages.

Additionally, in response to a request from the superior court, the State provided a "general explanation of the categories of damages" it seeks in this case. The State divided its requests into two categories: (1) "Damages Claims for MTBE Contamination at Any Level"; and (2) "Damages Claims for MTBE Contamination At or Above the AGQS/MCL." With regard to the first category, the State seeks

1. *Present and future public water system costs.* All present and future costs associated with the presence of MTBE at any level in public water systems, including the full costs of treatment and removal of MTBE at any level.

2. *Present and future private well and non-public water system costs.* All present and future costs of implementing and maintaining a comprehensive, statewide investigation, monitoring and treatment program for private wells and other unregulated . . . water systems, including the full costs of treatment and removal of MTBE at any level.

With regard to the second category, the State seeks

3. *Past public and private well costs.* All past public and private well costs associated with MTBE reimbursed through State reimbursement funds . . . . Because State fund expenditures are linked to the MCL for MTBE, the State is not seeking past public and private well costs associated with the presence of MTBE below the MCL.

4. *Site remediation costs.* All past, present and future costs paid by the State reimbursement funds . . . attributable to the presence of MTBE at contaminated sites.

The Superior Court held a hearing on the defendants' motion and proposed an interlocutory transfer. Pursuant to Supreme Court Rule 9, the Superior Court (*Fauver*, J.) transferred the following questions:

1. If the State is the trustee of the waters of New Hampshire, do all costs of investigating, monitoring, treating, remediating, replacing or otherwise restoring state water contaminated by MTBE, regardless of whether the MTBE is detected in a

privately or publicly owned well, constitute damages the State is entitled to recover on its own behalf?

2. Did *City of Dover* hold that recovery of private damages to the State is permissible, or specifically authorized, in a *parens patriae* action?

Based upon the record available to us at this time, we hold, as explained below, that the State is not precluded from recovering damages related to MTBE contamination in a privately owned well. We remand to the Superior Court to determine the exact scope of damages available to the State within the limits explained below. Based upon our answer to the first question, we deem it unnecessary to reach the second question.

The MTBE defendants conceded at oral argument that the State may recover damages to test and treat statutorily defined public water systems. Thus, the crux of the current dispute is whether the State can recover damages with regard to non-public wells.

The State asserts two theories as to why we should answer the first question in the affirmative. It argues that it has the right and duty to protect its citizens from MTBE contamination in the State's water supply both in its *parens patriae* capacity and as trustee of the State's water supply. The MTBE defendants respond that the State's authority to recover damages for MTBE contamination as trustee of the water supply is "one and the same" as its authority as *parens patriae*.

The public trust doctrine, from which the State's authority as trustee stems, and the *parens patriae* doctrine are both available to states seeking to remedy environmental harm. *See generally* Kanner, *The Public Trust Doctrine, Parens Patriae, and the Attorney General as the Guardian of the State's Natural Resources*, 16 DUKE ENVTL. L. & POL'Y F. 57, 59 (2005). The public trust doctrine provides that the government holds public lands, waters and other natural resources in trust for the benefit of its citizens. *Id.* at 62. As trustee, the government "must act as a fiduciary in its management of the resources which constitute the corpus of the trust." *Id.* at 76 (quotation omitted). The doctrine allows a state attorney general, as trustee, to bring a cause of action for damages to natural resources held in trust by the State. *Id.* at 59. To bring a successful claim, the State must prove an unreasonable interference with the use and enjoyment of trust rights. *Id.* While some states allow recovery for damages to any natural resources, others allow recovery only for natural resources actually owned or held in trust by the State. *Id.*

While the public trust doctrine is its own cause of action, *parens patriae* is a "concept of standing," which allows the state to protect certain

"quasi-sovereign" interests. *City of Dover*, 153 N.H. at 185 (quotations omitted). These interests include the health, comfort and welfare of a state's citizens, interstate water rights, and the general economy of the state. *Id.* at 185-86. *Parens patriae* does not provide a cause of action, but may provide a state with standing to bring suit to protect a broader range of natural resources than the public trust doctrine because it does not require state ownership of such resources. *New Mexico v. General Elec. Co.*, 467 F.3d 1223, 1243 n.30 (10th Cir. 2006).

Here, however, the State does not explicitly rely upon the public trust doctrine as a separate cause of action, and instead asserts that it must act in the citizens' interest as the trustee of the statewide water supply. Indeed, the General Court has declared that the State is the trustee over all of the State's water. RSA 481:1 (2001) provides that

> an adequate supply of water is indispensable to the health, welfare and safety of the people of the state and is essential to the balance of the natural environment of the state. Further, the water resources of the state are subject to an ever-increasing demand for new and competing uses. The general court declares and determines that the water of New Hampshire whether located above or below ground constitutes a limited and, therefore, precious and invaluable public resource which should be protected, conserved and managed in the interest of present and future generations. The state as *trustee of this resource for the public benefit* declares that it has the authority and responsibility to provide careful stewardship over *all the waters* lying within its boundaries. The maximum public benefit shall be sought . . . . All levels of government within the state . . . and all other entities, *public or private*, having authority over the use, disposition or diversion of water resources, or over the use of the land overlying, or adjacent to, the water resources of the state, shall comply with this policy and with the state's comprehensive plan and program for water resources management and protection.

(Emphases added.) As trustee, the State must preserve the State's waters for the trust's beneficiaries, and the State can bring suit to protect the waters over which it is trustee from contamination. *See Illinois Central Railroad v. Illinois*, 146 U.S. 387, 455-56 (1892); *State of Maryland, Dept. of N. Res. v. Amerada Hess Corp.*, 350 F. Supp. 1060, 1067 (D. Md. 1972).

While we recognize the State's responsibility to protect its citizens from toxins in their drinking water, the State's role as trustee does not automatically confer *parens patriae* standing to recover all damages

associated with privately owned wells because a natural resources trustee still may not recover damages belonging to private citizens. *Quapaw Tribe of Oklahoma v. Blue Tee Corp.*, 653 F. Supp. 2d 1166, 1181 (N.D. Okla. 2009). Accordingly, we next turn to the requirements for standing as *parens patriae*.

█ In *City of Dover*, we set forth the two requirements for a state to have *parens patriae* standing. As the United States Supreme Court delineated in *Alfred L. Snapp & Son, Inc. v Puerto Rico*, 458 U.S. 592 (1982), the state must first assert "an injury to a 'quasi sovereign' interest, an interest apart from the interests of particular private parties. Second, the state must allege injury to a 'substantial segment' of its population." *City of Dover*, 153 N.H. at 186 (quotation omitted). We determined that the State met the first criteria because it "has a quasi-sovereign interest in protecting the health and well-being, both physical and economic, of its residents with respect to the statewide water supply." *Id.* We also determined that the State met the second criteria because the State alleged that MTBE was present in hundreds of public water systems and approximately 40,000 private water supplies. *Id.* at 187.

██ Our holding in *City of Dover* does not mean that the State can recover all MTBE-related damages from the defendants. *See People of State of N.Y. v. Operation Rescue Nat.*, 80 F.3d 64, 71 (2d Cir.) (*parens patriae* standing "does not extend to the vindication of the private interests of third parties"), *cert. denied*, 519 U.S. 825 (1996). However, a state may act as the representative of its citizens "where the injury alleged affects the general population of a State in a substantial way." *Maryland v. Louisiana*, 451 U.S. 725, 737 (1981). Accordingly, our inquiry now focuses upon the scope of the State's standing and whether the specific types of damages that the State requests are sufficiently "apart from the interests of particular private parties." *Massachusetts v. Bull HN Information Systems*, 16 F. Supp. 2d 90, 96 (D. Mass. 1998).

█ The doctrine of *parens patriae* originated in English common law, and was first recognized in American law in a series of United States Supreme Court cases at the beginning of the twentieth century. *See, e.g., Missouri v. Illinois & Chicago District*, 180 U.S. 208 (1901); *Georgia v. Tennessee Copper Co.*, 206 U.S. 230 (1907); *Kansas v. Colorado*, 206 U.S. 46 (1907); *New York v. New Jersey*, 256 U.S. 296 (1921); *Wyoming v. Colorado*, 259 U.S. 419 (1922). Many of these cases concerned disputes regarding water and the Supreme Court consistently held that states have a right to appear as *parens patriae* regardless of the rights of individual and private users of the water. *See People of the State of California v. United States*,

180 F.2d 596, 601 (9th Cir.) (collecting United States Supreme Court cases discussing *parens patriae* standing in cases involving water), *cert. denied*, 340 U.S. 826 (1950). While acknowledging that the complained of conduct may affect private citizens or privately owned land, these cases also provide the states with wide latitude to protect their natural resources because "the interests of the State are indissolubly linked with the rights of the [private] appropriators" or users. *Wyoming v. Colorado*, 259 U.S. at 468.

In the first of these cases, *Missouri v. Illinois*, Missouri sought to enjoin Illinois from discharging sewage into Missouri's portion of the Mississippi River. *Missouri v. Illinois*, 180 U.S. at 209-10. The Court recognized that the case did not involve a boundary dispute or property rights directly belonging to one of the states. *Id.* at 241. Nonetheless, the Court concluded that "if the health and comfort of the inhabitants of a State are threatened, the State is the proper party to represent and defend them." *Id.* Furthermore, the Court reasoned that the pollution did not affect just those living along the banks of the river because any diseases resulting from the pollution could spread throughout the entire state. *Id.* Additionally, the Court feared that individual suits for personal injuries would provide "wholly inadequate and disproportionate remedies." *Id.*

The Court followed similar reasoning in *Tennessee Copper Co.*, in which Georgia sought to prevent the corporate defendant from discharging noxious gases across the border from its plant in Tennessee. *Tennessee Copper Co.*, 206 U.S. at 236. Although Georgia actually owned only a small portion of the affected territory, it still had standing to bring suit in its quasi-sovereign capacity because of its interest "independent of and behind the titles of its citizens, in all the earth and air within its domain. It has the last word as to whether its mountains shall be stripped of their forests and its inhabitants shall breathe pure air." *Id.* at 237.

The Court later extended the doctrine to allow a state to protect the economic and commercial interests of its citizens. *See, e.g., Penna. v. West Virginia*, 262 U.S. 553, 592 (1923) (holding that two states had standing to sue West Virginia for mandating that gas producers first serve the needs of local customers because the withdrawal of gas from interstate commerce was "a matter of grave public concern," which "seriously jeopardized" the health, comfort and welfare of a substantial portion of the states' population); *Maryland v. Louisiana*, 451 U.S. at 739 (determining that several states could challenge a tax on certain uses of natural gas imported into Louisiana because of the states' "interest in protecting [their] citizens from substantial economic injury").

*Alfred L. Snapp* further expanded and explained the modern requirements for *parens patriae* standing. There, the Court considered whether Puerto Rico could properly bring suit against Virginian apple growers for

an alleged violation of federal law. *Alfred L. Snapp*, 458 U.S. at 594. Puerto Rico claimed that the apple growers violated federal laws and regulations that required employers to seek domestic workers for any job opening before employing temporary foreign laborers and prevented employers from discriminating against domestic workers or adversely affecting their working conditions. *Id.* at 597-98. The dispute arose when Puerto Rico sent 420 workers to Virginia, but fewer than thirty were actually employed by the apple growers. *Id.* at 597. Puerto Rico alleged that the discrimination deprived it of its right to benefit from United States laws and caused irreparable injury to its efforts to promote employment for Puerto Rican workers and reduce unemployment in Puerto Rico. *Id.* at 598.

In concluding that Puerto Rico had standing, the Court stated that "[j]ust as we have long recognized that a State's interests in the health and well-being of its residents extend beyond mere physical interests to economic and commercial interests, we recognize a similar state interest in securing residents from the harmful effects of discrimination." *Id.* at 609. The Court also agreed with the Court of Appeals that "deliberate efforts to stigmatize the labor force as inferior carry a universal sting." *Id.* (quotation and brackets omitted). Alternatively, the Court determined that Puerto Rico had a quasi-sovereign interest in ensuring its citizens' full participation in the federal employment service scheme because high unemployment among Puerto Ricans was a legitimate state concern. *Id.*

To counter this line of cases expanding *parens patriae* standing, the MTBE defendants rely upon a series of cases denying *parens patriae* standing. *See, e.g., Oklahoma v. Cook*, 304 U.S. 387 (1938); *Oklahoma v. A., T. & Santa Fe Ry.*, 220 U.S. 277 (1911); *N.H. v. Louisiana: N.Y. v. Louisiana*, 108 U.S. 76 (1883). However, these cases all stand for the proposition that money damages are unavailable to the State in a *parens patriae* case where the State seeks to recover solely for the benefit of private individuals. *See Operation Rescue Nat.*, 80 F.3d at 71-72. We find these cases unpersuasive where the State has alleged a statewide injury affecting the health and well-being of a substantial portion of its citizens. *But see People of State of N.Y. by Abrams v. Seneci*, 817 F.2d 1015, 1017-18 (2d Cir. 1987) (denying standing where damages for a fraudulent business opportunities scheme were designed to directly provide restitution to only seventy-nine consumers rather than compensate the State for injury to the integrity of its marketplace).

While these *parens patriae* cases illustrate the broad scope of the doctrine, they do not directly address the specific types of damages available to a state in its *parens patriae* capacity. More recently, two courts have addressed this question. In *Satsky v. Paramount Communications, Inc. (Satsky II)*, 7 F.3d 1464 (10th Cir. 1993), the court determined that an

earlier consent decree between Colorado and a mine owner barred some claims of private property owners against the mine. *Id.* at 1470. The private property owners sought damages for hazardous waste produced by mining activities in the area surrounding the Eagle Mine and Eagle River. *Id.* at 1466. The court explained that the prior consent decree barred only those claims "for injuries to interests which all citizens hold in common," and that the plaintiffs could pursue those claims that "involve[d] injuries to purely private interests." *Id.* at 1470. The court remanded the case to the district court "to determine which claims . . . are truly private, and which claims are based on common public rights." *Id.*

On remand, the district court considered whether the consent decree barred three categories of damages. *Satsky v. Paramount Communications, Inc. (Satsky III)*, No. Civ.A. 90-S-1561, 1996 WL 1062376 (D. Colo. March 13, 1996). First, the plaintiffs sought damages to pay for medical monitoring and health studies in the affected areas. *Id.* at *4. The court reasoned that while an individualized medical monitoring claim might be private, the "request for broad medical monitoring and surveillance studies [was] not a 'truly private' claim, but rather a public health study," and thus barred by the consent decree. *Id.* at *6. Second, the plaintiffs requested damages for impaired water quality and the "increased costs of personal protection" because of contaminated water. *Id.* (quotation omitted). The court barred recovery for any claims relating to natural resources held by Colorado, such as common rights to use river water for irrigation, but allowed any claims for damages relating to private adjudicated water rights. *Id.* at *7. Third, the court allowed claims for direct loss of income, loss of asset value and increased operating expenses because they were "arguably private claims based on direct injury to the Plaintiffs' private property." *Id.*

In the second case, *Quapaw Tribe of Oklahoma*, the court differentiated between claims for which the Quapaw Tribe could recover and those that were private claims of tribal members. *Quapaw Tribe of Oklahoma*, 653 F. Supp. 2d at 1179. The Tribe had filed suit on behalf of its members against several mining companies for damages relating to the companies' use of tribal land. The court first determined that the Tribe was the proper party to bring a claim for damages to Tribal land because private landowners could not recover those damages. *Id.* at 1181. However, the court denied the Tribe standing for damages for "lost use" of land owned by tribal members because economic gain from beneficial use of the land flowed directly to the landholder. *Id.* at 1183. Second, the Court denied the mining companies' motion for summary judgment with regard to the Tribe's standing to pursue damages for subsidence (*i.e.*, "the rapid sinking of the surface caused by lack of support underneath the surface of the land," *id.* at 1184

(quotation omitted)) or the risk of subsidence to tribal land. *Id.* at 1186. While individual Tribal members owned all of the affected land, the court reasoned that "[s]ubsidence or the risk of subsidence affects all who use certain land, and the impact of subsidence may go beyond harm to the individual landowners." *Id.*

The MTBE defendants rely on these cases to argue that the damages the State seeks to recover are not based on public rights held in common by citizens of New Hampshire. They assert a distinction between injury to a public resource for which a state can recover and damages stemming from injury to the same resource that can only be recovered by private individuals. Accordingly, they contend that simply because water is a public resource does not mean that there can be no "private damages" associated with that resource.

 We agree with the defendants that not all potential damages related to MTBE contamination in New Hampshire waters can properly be recovered by the State in its capacity as *parens patriae.* In fact, the State conceded at oral argument, and we agree, that claims for diminution in value of private property, lost business expenditures and other business and economic losses resulting from MTBE contamination properly belong to private parties. Nonetheless, the fact that MTBE is detected in a privately owned well does not necessarily preclude the State from pursuing damages for the costs of investigating, monitoring, treating, remediating, replacing, or otherwise restoring such wells.

The MTBE defendants point out that the damages related to privately owned wells are purely private in nature because remedying MTBE contamination in a private well only benefits that individual well owner. However, the State has alleged widespread MTBE contamination in privately owned wells throughout the state. In *City of Dover*, we noted that in 2002, the State alleged that MTBE was present in 13.2% of the statewide water supplies, including approximately 40,000 private water supplies. *City of Dover*, 153 N.H. at 187. Additionally, the State's Second Amended Complaint alleges that in 2005 and 2006 testing, MTBE was present in 9.1% of private wells statewide and in 17% of private wells in the counties that participated in the RFG program. Despite these allegations, the MTBE defendants claim that the State has failed to collect and provide comprehensive testing data regarding private wells. Additionally, a 2007 U.S. Geological Survey study of MTBE contamination in New Hampshire's groundwater found that only one of 264 private wells tested had an MTBE contamination that exceeded the state action level for notification of

adjacent well owners, which is a MCL of five parts per billion. None of the private wells exceeded the State's primary MCL of thirteen parts per billion.

The State also argues that private well contamination affects its entire citizenry because while some wells only serve a single family or business, these wells ultimately draw their water from the groundwater over which the State is trustee. *See* RSA 485-C:1, II (2001) (the State "has general responsibility for groundwater management in the public trust and interest"); *see also Coakley v. Maine Bonding & Cas. Co.*, 136 N.H. 402, 413 (1992) (groundwater is a "unique and irreplaceable government resource"). Furthermore, the State asserts that private well owners have only a usufructuary interest in their groundwater that is subject to the State's interest as trustee, *see Appeal of Town of Nottingham*, 153 N.H. 539, 548 (2006), but the MTBE defendants contend that the State loses its interest in the water once it enters a privately owned well.

These are all factual issues for the trial court on remand and for the finder of fact at trial. Nonetheless, based upon the record available to us at this time, the alleged impact of private well contamination may go beyond harm to an individual well owner. However, as both the *Satsky* and *Quapaw Tribe* cases demonstrate, the State's damages in this case are not unlimited and are subject to at least some limiting principles. We base our answer to the Superior Court's question on the limited record available to us at this stage of the proceedings, and note that this question comes to us on a motion for partial summary judgment.

We first note that because this case comes to us on the defendants' motion for partial summary judgment, the defendants, as the moving party, have the burden to demonstrate that there is no genuine issue as to any material fact. *Sabinson v. Trustees of Dartmouth College*, 160 N.H. 452, 460 (2010). Should the case go to trial, the burden will rest with the State to prove that it meets all of the requirements for *parens patriae* standing. *City of Dover*, 153 N.H. at 186. However, at this stage, the defendants have the burden of proving that the uncontested facts establish that the State is not entitled to *parens patriae* standing with regard to all of the damages that it seeks.

Accordingly, on remand, and in ruling on the MTBE defendants' motion for summary judgment, the trial court should determine whether the uncontested facts establish that the defendants have met their burden to prove that the State has not alleged injury, either direct or indirect, to a sufficiently substantial segment of privately owned wells. *See Quapaw Tribe of Oklahoma*, 653 F. Supp. 2d at 1179; *Alfred L. Snapp*, 458 U.S. at 607; *City of Dover*, 153 N.H. at 186-87. In doing so, the court should

consider both private well contamination throughout the entire state and specifically in the four most-affected counties.

Second, the trial court should determine whether the defendants can meet their burden of proving that the State's allegations of injury to private wells are speculative in nature. *See Quapaw Tribe of Oklahoma*, 653 F. Supp. 2d at 1179. By this, we mean that the defendants must put forth evidence that shows that MTBE contamination is unlikely in the private water supply in a given area or region. To refute any such evidence, the State could point to the presence of gas stations in a given area that sold gasoline containing MTBE, or rely upon the 2007 U.S. Geological Survey, which indicated areas in the State with high incidences of MTBE contamination. We intend this requirement to prevent the State from being given a blank check to investigate and test for alleged MTBE contamination in areas of New Hampshire where the State has provided little evidence of an actual risk of contamination.

In this regard, the trial court should give especially close scrutiny to the State's request for "[p]resent and future private well and non-public water system costs" at any level. Pursuant to this request, the State seeks "[a]ll present and future costs of implementing and maintaining a comprehensive, statewide investigation, monitoring and treatment program for private wells." We recognize the State's concern that a large percentage of the State's population relies on private wells for drinking water. However, the State has set an MCL/AGQS level, above which it deems MTBE to be a risk to the public's health and well-being. Although the State may be able to prove at trial that MTBE contamination below the MCL/AGQS level poses a threat to the public's health and well-being, the trial court should consider the evidence on the summary judgment record to determine whether the defendants can meet their burden of proof at this stage and show that the State's request for all costs at any MCL/AGQS level is too speculative and oversteps its authority as *parens patriae*.

Based on these factors, the court must determine whether "there may [be] a community-wide risk presented by the alleged [contamination] that goes beyond harm to the individual [well owners]." *Quapaw Tribe of Oklahoma*, 653 F. Supp. 2d at 1187; *see also Penna. v. West Virginia*, 262 U.S. at 592 (determining that when the health, comfort and welfare of a substantial number of private consumers are seriously jeopardized, it is a matter of "grave public concern").

Additionally, as part of the standing inquiry, some courts have considered the difficulty of individuals bringing their own suits for damages. *See Maryland v. Louisiana*, 451 U.S. at 739 (observing that individual consumers were unlikely to litigate the validity of a tax when the amounts paid to each consumer are likely to be relatively small); *Missouri v. Illinois*, 180

U.S. at 241 ("That suits brought by individuals, each for personal injuries, threatened or received, would be wholly inadequate and disproportionate remedies, requires no argument."). The State argues that individual plaintiffs would have to litigate against many of the largest gasoline companies in the world because many courts have refused to certify MTBE class actions by private property owners. *See, e.g., In re Methyl Tertiary Butyl Ether Prods. Litig.*, 209 F.R.D. 323, 337 (S.D.N.Y. 2002); *Millett v. Atlantic Richfield Co.*, 760 A.2d 250 (Me. 2000). At this point, there is a factual dispute regarding whether a class action or individual suits against the MTBE defendants are possible and we leave it to the trial court to determine the weight to be given to this factor.

Finally, the MTBE defendants assert that the State may recover damages to test and treat privately owned wells only to have some well owners refuse to allow the State to treat their wells. First, the State has a right to appear as *parens patriae* regardless of the rights of individual private appropriators or users of water. *People of the State of California v. United States*, 180 F.2d at 601; *see also Hudson Water Co. v. McCarter*, 209 U.S. 349, 355 (1908). Additionally, there is no evidence in the record at this time that private well owners would actually object to state testing and treatment of their wells. The defendants' concern relates more to the exact dollar amount of damages recoverable by the State and is more appropriate to be resolved after trial than on the pleadings. *See State of Maine v. M/V Tamano*, 357 F. Supp. 1097, 1102 (D. Me. 1973). At that stage, any monetary damages claimed by citizens individually may be excluded from the State's recovery. *See id.*

*Remanded.*

HICKS, J., concurred; HORTON, J., retired, specially assigned under RSA 490:3, concurred.